UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
IN RE: WORLD TRADE CENTER DISASTER SITE      21MC100 (AKH)
LITIGATION
------------------------------------------------------------------------X
IN RE: WORLD TRADE CENTER LOWER MANHATTAN
DISASTER SITE LITIGATION                                           21MC102 (AKH)
------------------------------------------------------------------------X
IN RE: COMBINED WORLD TRADE CENTER AND
LOWER MANHATTAN DISASTER SITE LITIGATION      21MC103 (AKH)
(STRADDLER PLAINTIFFS)
------------------------------------------------------------------------X

**PLAINTIFFS' RESPONSE TO JANUARY 24, 2012 ORDER
REQUESTING INFORMATION RELEVANT TO
CONTINGENT PAYMENT PROVISIONS OF THE FINAL
SETTLEMENT AGREEMENT**

Plaintiffs, by and through 21MC100 Co-Liaison Counsel WORBY GRONER EDELMAN & NAPOLI BERN, LLP hereby respond to this Court's Order of January 24, 2012 requesting information regarding the Contingent Payment Provision (Section IV) of the Settlement Process Agreement, As Amended ("SPA").

This Court requested the parties' respective positions on whether there is a Contingent Payment due where, on January 5, 2012, there were less than 120 New Debris Removal claims pending or commenced as actions before this Court. Plaintiffs believe the only answer is "**Yes, the First Contingent Payment is due and owing to plaintiffs**".

Section IV (Contingent Payments) of the SPA describes the nature, timing and criteria for future additional payments that the settling plaintiffs are entitled to receive in addition to the Settlement Amount. This section of the agreement describes which Plaintiffs will be entitled to a pro rata share of these Contingent Payments. The single purpose for the inclusion of this provision in the SPA was the desire of the WTC Captive Insurance Company Inc. and of its Insureds, the City of New York and its Contractors (collectively here, the "Captive"), to protect

1

themselves from ongoing expenses that would be incurred from any New Debris Removal Claims.  The mechanisms put in place were created to deter future litigation costs and to award those Tier 4 Plaintiffs who decided to opt-in to the SPA with additional compensation.  The underlying logic was that if the WTC Captive was not expending money on defending against new filings over a necessary reserve amount, those resources should be made available (due to the lack of additional New Debris Removal claims) to increase the monies paid to the settling Plaintiffs.

To that end, a complex formula was developed to determine the payment amounts.  The amount of these Contingent Payments would be based upon: (i) the amount of New Debris Removal Claims; (ii) the amount of money, if any, paid by the WTC Captive on behalf of the Insureds or any of them to satisfy judgments or fund the settlement(s) of Debris Removal Claims by Plaintiffs who do not opt into the Final Settlement Agreement (Opt-Out Costs"); and (iii) Indemnification Costs.  The First Contingent Payment Determination Date is defined as the Final Settlement Agreement Effective Date plus one year, which was January 5, 2012.  The amount of the First Contingent Payment is calculated based upon the number of New Debris Removal Claims as follows:

**First Contingent Payment**

| Number of New Debris Removal Claims Filed or Submitted to the City of New York as of First Contingent Payment Determination Date | First Contingent Payment (subject to the Opt-Out Costs and Indemnification Costs Provision below) |
|---|---|
| 120 or less | $5,000,000.00 |
| 121 to 219 | $5,000,000.00 minus $50,000.00 for each New Debris Removal Claim in excess of the 120th New Debris Removal Claim filed as of the First Contingent Payment Determination Date |
| 220 or more | $0.00 |

Furthermore, the First Contingent Payment shall be reduced if, from the Effective Date (January 5, 2011) to the First Contingent Payment Determination Date (January 5, 2012), cumulative Opt-Out Costs and Indemnification Costs exceed Seven Million Dollars ($7,000,000.00). This reduction shall be in the amount of one dollar for every one dollar of cumulative Opt-Out Costs and Indemnification Costs that exceed $7,000,000.00. *See* SPA § IV.C.

As of the date of this filing, the parties to the SPA have not met and conferred on whether or not the First Contingent Payment is due. It was not until February 9, 2012 that counsel for the Captive provided Plaintiffs' Liaison Counsel with the updated information necessary to determine whether or not the parties are in agreement on the amount of the First Contingent Payment. Plaintiff's Liaison is not able to gather this information themselves, since some of the filings may be "Notices of Claim" pursuant to New York General Municipal Law ("GML") §50-e. Notices of Claim are not public filings and thus are known only to the City of New York and its insurance carrier, *i.e.,* the Captive. Counsel for the Captive subsequently submitted this information to the Court on the following day, February 10, 2012, as "Schedules A & B" without giving Plaintiffs' Liaison Counsel reasonable time to verify this information. At this writing, the Captive still has not provided Plaintiffs' Liaison Counsel with its cumulative Opt-Out Costs and Indemnification Costs to assess those costs. We thereby have no choice but to assume such costs must be zero. All of this information is necessary to determine the amount of the First Contingent Payment. The Captive is the only party privy to the total amount of New Debris Removal Claims, cumulative Opt-Out Costs and Indemnification Costs. As stated, Plaintiffs' Liaison Counsel does not have access to any of this information. After reviewing the Captive's list this past weekend, Plaintiffs' Liaison Counsel is mostly in agreement with the disposition of

3

each case on the Captive's list, except for the status of the Enzo Ardovni (10-CV-06632) case. According to our review of the docket entries for this case, brought by a *pro se* plaintiff, the matter was involuntarily dismissed by this Court on November 10, 2010 by the Endorsement Order dated November 10, 2010 affixed to Patton Boggs' letter of November 9, 2010. The Plaintiffs also disagree with the Captive's characterization of this information and how it should be utilized to calculate the amount of the First Contingent Payment, the tender of which we believe is overdue.

    Of great importance, the SPA contains no mention of the Victims' Compensation Fund created as part of the JAMES ZADROGA 9/11 HEALTH AND COMPENSATION ACT OF 2010, Pub. L. No. 111-347, 124 Stat. 3623 ("Zadroga Act"). The reason the Zadroga Act is not mentioned in the SPA is because the SPA was executed by the parties on June 10, 2010 and later confirmed by this Court on June 23, 2010, following a Fairness Hearing. The Zadroga Act was not enacted until January 2, 2011 when President Obama signed it into law, six (6) months *after* the SPA was executed and approved by this Court. At the time the SPA was signed, there was little-to-no hope of there being a Zadroga Act. The bill had been defeated in the House and at the time, it seemed unlikely that the Senate would take up the bill. Accordingly, any reference to (or reliance on) the Zadroga Act in drafting the SPA would have been speculative, at best.

    Because of the enactment of Jimmy Nolan's Law (amending GML § 50-e) which provided a one-year safety net for otherwise time-barred claimants to file a Notice of Claim against the City of New York, many potential New Debris Claimants filed Notices Of Claim with the City of New York to protect their rights and investigate whether they had a viable cause of action. Most never followed through by actually commencing an action before this Court. Their time to commence an action by filing a complaint with this Court having expired, these

cases can not be revived later because the General Municipal Law only provides for a year and ninety days to commence an action against the City, even where a court has granted leave to file a late Notice of Claim. *See* GML §50-i(1). Accordingly, these cases should not be counted towards the 120-case limit.

Of the two hundred sixty (260) plaintiffs who filed a Notice of Claim against the City *after* the April 12, 2010 cut-off date set in Section IV of the SPA, only eighty-four (84) remain active as of today (74 of these claims have filed complaints before this Court, the remaining 10 have only filed Notices Of Claim against the City, but the time within which to file a complaint arising from these 10 Notices of Claim has not expired). Of the remaining one hundred seventy-six (176) claims: forty-two (42) cases were involuntarily dismissed *sua sponte*; eighty-five (85) cases were voluntarily discontinued; forty-seven (47) cases had their Notices of Claim expire; and two (2) cases were involuntarily dismissed. *The 84 claims that remain active today are well below the Contingent Payment cutoff limit of 120 filings*. Thus, the City and its contractors (and their insurer, the Captive) have received precisely the benefit they bargained for in SPA Section IV, a limitation on the number of claims for which they will have to expend litigation and defense costs going forward. *Again, this is well below the Contingent Payment cutoff limit of 120 filings*.

Once the Zadroga Act was enacted the vast majority of the New Debris Removal Claims and Opt-Out claims were discontinued in order for those individuals to seek compensation from the Victims' Compensation Fund pursuant to the Zadroga Act. As a result of all of these discontinued actions, the Captive and its insureds incurred minimal, if any, costs on New Debris Removal Claims or Opt-Out Claims. As noted *supra*, pursuant to Schedule "A" in the Captive's February 10, 2012 submission, there are only eighty-four (84) active New Debris Removal

Claims. Hence the WTC Captive and its insureds got exactly what they bargained for in the SPA: essentially, one year after the final effective date of the SPA, on January 5, 2012, there are less than 120 New Debris Removal Claims. The fact that a Notice of Claim may have been filed but was subsequently not perfected or an action was commenced but dismissed prior to the January 5th deadline should inure to the plaintiffs' benefit, not to the benefit of the Captive. There are currently far less than 120 New Debris Removal Claims. Accordingly, the amount of the First Contingency Payment should be five million dollars ($5,000,000.00) plus interest since January 5, 2012. It only makes sense, indeed, justice can only be served, if the actual number of *still active*, *actually commenced* litigations as of January 5, 2012 is counted for this purpose rather than Notices of Claim filed to determine whether the Contingent Payment conditions have been met.

Hence, the Plaintiffs calculate the First Contingent Payment to be five million dollars ($5,000,000.00) plus interest since January 5, 2012.

## DISCUSSION

This Court has issued a series of Orders arising from a similar provision in the SPA, *i.e.,* the Bonus Payment that is based upon the Opt-in percentage of the Eligible Plaintiffs. Much of this Court's reasoning and analysis of its holdings on those Bonus Payments is equally applicable to Section IV, dealing with the Contingent Payments. For example, in addressing the underlying purposes of the Bonus Payments, this Court wrote:

> Nothing in the language of the SPA supports the argument of the WTC Captive and the City that they are not obligated to remove involuntarily dismissed Plaintiffs from the list of Plaintiffs eligible to settle. As they concede in their briefing, the parties' agreement shows that they contemplated only that Plaintiffs would choose to settle their cases or continue litigating. The situation presented differs from those in which the language of the SPA has spoken to

6

> the issue. The absence of choice was an unforeseen contingency, which requires judicial consideration.

*See*, September 8, 2011 Order, at p. 9. As this Court held with regard to the Bonus Payment(s), it is similarly clear that the Contingency Payment section was drafted to address how many new plaintiffs' claims would have to be defended by the Captive, hence incurring litigation and defense costs that might otherwise be funneled back to the Settling Plaintiffs. Similarly, indeed, *strikingly* applicable is the following language from the September 8, 2011 Order:

> The objection of the WTC Captive and the City to bonus payments has no principled basis, and breaches a material obligation on their part to be performed under the SPA. Requiring the WTC Captive to make bonus payments *accords with the objective intention of the parties, as expressed in the SPA* and as communicated to, and objectively understood by, the settling Plaintiffs, that the WTC Captive and the City are to pay settlement funds commensurate with the number of eligible Plaintiffs who chose to settle their cases."

*Id* at page 9 (emphasis added). This Court also explained the basis for its involvement in construing the SPA:

> Because the settlement was made in the aggregate and not in respect of individual cases, it is the equivalent of a class settlement and not an aggregate of individual settlements. The Court has jurisdiction and responsibility to review the terms of the settlement and to determine its fairness and reasonableness. Congress vested this Court with the power to manage and supervise these cases when it consolidated all litigation in the United States District Court for the Southern District of New York, which has exclusive jurisdiction over all cases arising from the terrorist-related aircraft crashes of September 11**,** 2001. *See* ATSSSA § 408(b)(I), (3). Congress, in consolidating this entire litigation in this Court, contemplated that it should exercise such control, and should manage these cases to achieve a just and satisfactory resolution, just for Defendants as well as for Plaintiffs.

*Id*., at page 10. In the most recent Order addressing these Bonus issues, this Court noted that:

> …where a contract is not capable of straightforward interpretation, whether because it is ambiguous or because it is silent, *the court*

7

> *must honor the intentions of the parties*, construing the agreement against the drafter. Guardian Life Ins. Co. of Am. v. Schaefer, 70 N.Y.2d 888, 890 (N.Y. 1987). Although contractual silence does not always make a contract unclear, Evans v. Famous Music Corp. 1 N.Y.3d 452, 458 (N.Y. 2004), silence is capable of creating a gap that requires the court to construe the terms in light of the parties' intentions. See Reiss v. Fin. Performance Corp., 97 N.Y.2d 195, 199 (N.Y.2001). This is an expression of the broader rule that "the understanding of each promisor in a contract must include any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Rowe v. Great Atlantic & Pac. Tea Co., Inc. 46 N.Y.2d 62, 69 (N.Y. 1978) (quoting 5 Williston on Contracts §1293 (rev. ed 1937)).

Order of December 20, 2011, at pp. 15-16.

That language is equally applicable to the question now at bar. A reasonable person in the position of the promissee, here the plaintiffs, would unquestionably understand that claims for which nothing was ever filed and claims for which a Notice of Claim or even a Complaint was filed and subsequently discontinued or dismissed without defendants undertaking any affirmative litigation or discovery *should be counted in the same way* when determining whether the conditions necessary to trigger the first Contingent Payment under SPA Section IV have occurred. Only 74 new claims are pending before this Court that were filed after the April 12, 2010 cut off date (plus the 10 Notices of Claim that have thus far not matured into commenced actions and may never do so).

As this Court noted in the December 20, 2011 Order: "[t]he intention and purpose of the WTC Captive was to eliminate the exposure of the City and its contractors to 9/11 litigation." Order, December 20, 2011 at p. 17. This Court also recognized that in addition to the goal of gaining 95% opt in participation in the settlement, the Captive and its insureds also sought to gain 95% participation of the Tier 4 plaintiffs, *i.e.*, those who were most seriously impacted by WTC-related illness. *Id*. Plainly, the Captive and its insureds have received the entire benefit for which they bargained in that section of the SPA, as this Court has recognized ("The City and

8

its contractors, via the WTC Captive, achieved their objective, as 99.4 percent of the Debris Removal Plaintiffs chose to settle." *Id.*, at p. 18. Indeed, as this Court continued in the Order:

> **The WTC Captive clearly has achieved its purpose. It would be receiving an unneeded windfall if it were to be allowed to renege on its contractual obligation to pay the bonus payment** provided by the SPA to induce Tier IV Plaintiffs to opt into the settlement rather than continuing their cases against the City and its contractors.

Order, Dec. 20, 2011, at 18. That is even more true here, where the Captive has benefited from this Court's largesse in the form of involuntary dismissals and the benefit of so many plaintiffs or claimants forbearing in their litigations in favor of seeking their relief through the Zadroga programs. Should they be permitted to use these facts as a basis to deny the plaintiffs these Contingent Payments when the conditions set for the payments have so plainly been met? The only reasonable answer is: "of course not."

As this Court already recognized, *nothing* in the SPA says that the "Captive should grant to itself arbitrary discretion to decide who may be included and who may be excluded for the purpose of determining if it has to honor its full obligation to pay Tier IV Plaintiffs." *Id.*, at p. 19. The Captive assured the Court that the apparent favoring of lower tier plaintiffs in the settlement would be balanced by precisely the Bonus and Contingent Payments they are now attempting to avoid. *Id.*, at 23. Continuing with that analysis, this Court wrote:

> It is eminently unfair that sham Plaintiffs now be counted to defeat the payment of bonuses. Plaintiffs who were not interested in prosecuting their cases and who were dismissed with prejudice [*n.b.*: or who voluntarily discontinued their actions] should not be counted in determining the proportion of Plaintiffs choosing to settle [*n.b.*: or the number of late-filed new claims]. The Plaintiffs who were dismissed with prejudice do not present an exposure to the City, and should not be a pretext to allow the WTC Captive to renege on a promise on which the Tier IV Plaintiffs reasonably relied.

*Id.*, p. 24.

## CONCLUSION

The Captive should be required to pay the first Contingent Payment of $5 million to those Tier 4 plaintiffs who received and reasonably relied upon the Captive's promises to them and to this Court, without further delay.

Dated:   New York, New York
         February 14, 2012

>                    Respectfully submitted,
>
>                    WORBY GRONER EDELMAN & NAPOLI BERN, LLP
>                    *Plaintiffs' Co-Liaison Counsel*
>
>                    Paul J. Napoli (PN-8845)

**ATTORNEY CERTIFICATION OF SERVICE**

DENISE A. RUBIN, an Attorney duly licensed to practice before the Courts of the State of New York and a member of the Bar of this Honorable Court, hereby Certifies under penalty of perjury that on February 14, 2012, I have served Defendants' Liaison Counsel (Counsel for the City of New York and its Contractors) and Counsel for the WTC Captive Insurance Company, Inc., with a true copy of the within Response via email and through filing the same with the Court's ECF system

*[signature]*
DENISE A. RUBIN (DR5591)