

**WorbyGronerEdelman &NapoliBern LLP**
ATTORNEYS AT LAW

*[Handwritten note: The variety of information that pl. wishes to cover cause a "30(b)(6)" procedure to be unsuitable. Def.'s counsel should provide pl.'s counsel with the names of suitable witnesses to depose. 7-13-12]*

CHRISTOPHER R. LOPALO
CLOPALO@NAPOLIBERN.COM

July 12, 2012

VIA ELECTRONIC MAIL AND HAND DELIVERY

Hon. Alvin K. Hellerstein, U.S.D.J.
United States District Court for the
Southern District of New York
500 Pearl Street, Rm. 1050
New York, NY 10007

*[Stamp: RECEIVED JUL 2012]*
*[Stamp: USDC SDNY DOCUMENT ELECTRONICALLY FILED DOC #: ___ DATE FILED: 7/16/12]*

Re:   *In Re: World Trade Center Lower Manhattan Disaster Site Litigation*
      21 MC 102 (AKH)

Dear Judge Hellerstein:

The Plaintiffs represented by Worby Groner Edelman & Napoli Bern, LLP and Defendant Verizon New York, Inc. ("Verizon") jointly submit this letter regarding a Rule 30(b)(6) deposition discovery dispute. Pursuant to the Court's Rules, Plaintiffs and Defendants "met and conferred" about unresolved discovery issues on June 13, 2012, but were not able to resolve the dispute.

***Plaintiffs' Position:***

On April 11, 2012, Plaintiffs' Liaison Counsel served Verizon with a deposition notice pursuant to Fed. R. Civ. P. 30(b)(6). *See* Deposition Notice at Exhibit 1. On June 1, 2012, fifty-one (51) days after Plaintiffs' service of that notice, Verizon untimely served objections and responses to that deposition notice. Specifically, Verizon's counsel objected, quite literally, *to every single topic in the deposition notice*. Verizon finally produced its designated witness, Christopher Lloyd, on June 7 and June 8, 2012 for deposition, but the deposition was not concluded on those days, due in large part to Mr. Lloyd's admitted lack of knowledge about the relevant issues. Verizon should be compelled to produce an adequate witness with knowledge pursuant to Rule 30(b)(6) until such deposition is completed.



1


**WorbyGronerEdelman**
**&NapoliBern LLP**
ATTORNEYS AT LAW

As noted, *supra*, Verizon produced Christopher Lloyd, Esquire as its designated corporate Rule 30(b)(6) deposition witness. . Mr. Lloyd is an attorney and an active member of the Massachusetts State Bar. He testified that he had never even been physically present at 140 West Street ("the Verizon Building") until about a week or so before he was produced for his deposition. In fact, on June 7, 2012 Mr. Lloyd testified as follows:

> Q: When is the first time you physically went to the building?
>
> A: Approximately a week or so ago.
>
> Q: Let me make sure I'm clear. After the events of September 11, 2001, did you ever physically go to 140 West Street?
>
> A: The first time I went to 140 West Street was about a week ago.
>
> Q: Okay. Would it be fair to say you have no firsthand personal knowledge of the conditions at 140 West Street following the events of September 11th, 2001?
>
> MS. STEVENSON: Object to form.
>
> A: So, I was not at 140 West Street on 9/11 or thereafter.
>
> Q: You never physically went there?
>
> A: I never physically went there.
>
> Q: You never saw with your eyes or your senses the condition of the building at that time?
>
> A: I was not physically there.

*See* June 7, 2012 Deposition Transcript of Christopher Lloyd at 49:11 to 50:7.

Without question, Verizon had many employees with relevant knowledge responsive to the deposition notice and/or who were actually present at the Verizon Building following September 11, 2001. Such persons are likely more knowledgeable about the relevant events *and therefore able to testify credibly* about the clean-up work that was going on at the Verizon Building. Notwithstanding this fact, Verizon strategically decided to produce a witness who was never at the Verizon Building, who had no knowledge of the relevant facts and circumstances and who, as a result, was an essentially useless witness. Accordingly, the time of all of the attorneys present those two days was utterly wasted.

Mr. Lloyd testified that he is currently the Executive Director of Public Policy and Strategic Alliance; at the time of September 11, 2001, he was one of the Directors of the Safety and Health Environment Division at Verizon, but was never at the Verizon Building nor familiar with the relevant work at issue. Throughout his testimony, Mr. Lloyd's unfamiliarity with the physical description of the Verizon Building, as well as his unfamiliarity with the policies and procedures that were previously produced by Verizon in the course of this litigation, made him a completely inappropriate 30(b)(6) witness.

While deposition held in compliance with Rule 30(b)(6) "is not designed to be a memory contest, the deponent must be both knowledgeable about a given area and prepared to give *complete* and *binding* answers on behalf of the organization." *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 150 (S.D.N.Y. 1997). It was very apparent from Mr.



**WorbyGronerEdelman
&NapoliBern LLP**
ATTORNEYS AT LAW

Lloyd's testimony that he was neither knowledgeable nor well prepared to testify about most, if any, of the topics in the deposition notice. Moreover, Mr. Lloyd was not adequately prepared for his deposition. A deposition pursuant to Rule 30(b)(6) is substantially different from a witness's deposition as an individual. A witness proffered pursuant to 30(b)(6) testifies as a representative of the entity; his answers bind the entity and he is responsible for providing all the relevant information known or reasonably available to the entity. *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 2002 WL 1835439 at *3. (S.D.N.Y. August 8, 2002).

It is abundantly clear from Mr. Lloyd's testimony that he was not the best witness to testify about the Verizon Building project. Indeed, he was not even a minimally adequate witness. For example, Mr. Lloyd testified that he does not know who Verizon's building manager or supervisor was for the Verizon Building during the relevant time period. *See* June 7, 2012 deposition transcript of Christopher Lloyd at 58:12 to 58:25. However, Mr. Lloyd testified that the only Verizon employee that he remembers who was assigned the actual operation of the Verizon Building involved with that process after the events of 9/11/2001 was Dominick Veltri, who is still employed by Verizon. *See Id.* at 87:3 to 87:15. Additionally, Mr. Lloyd was unable to testify about the type of doors the Verizon building had in its lobby, the approximate square footage of the lobby or the approximate height of the lobby. *See Id.* at 88:25 to 89:9. Furthermore, Mr. Lloyd was unable to testify about the structural components of the Verizon Building. *See Id.* at 139:10 to 142:18. All of these matters are relevant to questions about adequate ventilation and other matters integral to this litigation.

Mr. Lloyd was also unable to adequately testify about the relationships of the workers at the Verizon Building. For example, he did not know who Hillman (a company that performed air sampling at the Verizon Building) reported to at Verizon. *See Id.* at 200:14 to 201:3. Additionally, Mr. Lloyd was unable to identify the first company that came to the Verizon Building to clean. *Id.* at 232:16 to 233:2. Mr. Lloyd was also unable to identify who at Verizon met with LVI (a clean-up contractor at the Verizon Building). *See Id.* at 235:12 to 235:17. He was unable to identify who at CES (a clean-up contractor at the Verizon Building) got information from Verizon before their workers began working at the site. *See Id.* at 239:3 to 239:6. Furthermore, Mr. Lloyd did not know if the Verizon workers who were actually at the Verizon Building kept records of when the clean-up contractors' work began. It is quite apparent that Verizon's designated witness had no clue about what actually occured at the Verizon Building, including what was required to access the Verizon building, where construction, renovation, clean-up, remediation and safety meetings took place, who attended such meetings and what was discussed at the meetings, among other important topics. Further,, Mr. Lloyd testified that although Verizon controlled access to the Verizon Building, he had no idea who specifically at Verizon controlled access to the Verizon Building. He was also unaware as to whether or not there were any logs that would indicate which Verizon personnel were controlling access into the site. *Id.* at 253:2 to 253:17. Additionally, Mr. Lloyd testified that he did not know how Verizon organized itself to communicate with the contractors at the Verizon Building. *See* June 8, 2012 deposition transcript of Christopher Lloyd at 276:23 to 277:7. Mr. Lloyd also testified that he did not know where the pre-job meeting with the clean-up contractors took place. *Id.* at 277:23 to 277:24. He further testified that he does not know who attended these pre-job meetings. *See Id.* at 277:25 to 278:3.



**&NapoliBern LLP**
ATTORNEYS AT LAW

Verizon's witness was unable to identify members of certain critical teams at the Verizon Building. For example, Mr. Lloyd was unable to identify anybody who was on the management team for LVI, CES and PAR (clean up contractors at the Verizon Building). *See Id.* at 278:4 to 277:12. Mr. Lloyd also testified that he did not know who was on the management team of the clean-up contractor used for the contamination in the subbasement, he did not know who attended the pre-job meeting on behalf of the asbestos management group, he did not know if anyone from Hygienetics or Hillman were invited to the pre-job meetings, and he also did not know if there were any minutes kept for any the pre-job meetings. *See Id.* at 278:3 to 279:22.

Mr. Lloyd was also incompetent to testify on the discussions that were held at meetings at the Verizon Building because he was not present at a single meeting and never reviewed any meeting summaries. For example, he testified that he did not know if job site safety was discussed at the pre-job meeting and does not know if anybody from safety, health and environment was at the pre-job meetings because he himself was not there. *See Id.* at 279:23 to 280:16. Mr. Lloyd further testified that he did not know if HEPA vacuums were discussed at the pre-job meeting. *See Id.* at 280:23 to 281:3. Additionally, Mr. Lloyd testified that he did not know if there were any discussions at the initial pre-job meeting as to how long the clean-up was expected to take. He also testified that he did not know if there were any specific meetings held among Verizon and its clean-up contractors and its Industrial Hygienist with regard to the personal protective equipment to be used during the course of the work. *See Id.* at 283:2 to 283:20.

Since Mr. Lloyd was never present at the Verizon Building and not involved in nor knowledgeable of the work there, he was unable to testify with any specificity as to what actually occurred at the Verizon Building during the post-9/11 debris removal and clean-up activities. For example, Mr. Lloyd testified that while Verizon shared the findings of the conditions in the Verizon Building with the contractors that were to perform the abatement work, but when asked how Verizon shared this information with them he testified that he did not know. *See Id.* at 283:22 to 284:9. Mr. Lloyd admitted during his deposition that he does not know the mechanics on how specific communications about test results were shared with the clean-up contractors. *See Id.* at 284:15 to 285:19. Furthermore, Mr. Lloyd admitted that he did not know if the clean-up workers were fitted for respirator use at the Verizon Building. *See Id.* at 291:17 to 291:23. Mr. Lloyd testified that he did not know if Verizon checked to find out what kind of licenses the cleanup workers had during the first week following 9/11/2001. *See Id.* at 294:7 to 294:11. Mr. Lloyd testified that he did not know how many cleanup workers would be on site on any given day within the first month of the events of 9/11/2001. *See Id.* at 297:5 to 297:10. Mr. Lloyd testified that he did not know if Verizon counted the number of workers admitted to the premises each day. *See Id.* at 297:25 to 294:4.

Verizon's designated witness was unable to testify as to who was actually doing the work at the Verizon Building because he was never there nor involved in it. For example, Mr. Lloyd was unable to identify contractors (other than Tishman) who performed construction and electrical work at the Verizon Building. *See Id.* at 300:05 to 303:7. Mr. Lloyd also testified that he did not know who the HVAC contractor was, who hired the HVAC contractor or how many HVAC workers were working at the Verizon Building. *See Id.* at 305:13 to 305:25. Mr. Lloyd also testified that he did not know how many electricians were brought on site to do the electrical


### &NapoliBern LLP
ATTORNEYS AT LAW

work. *See Id.* at 306:2 to 306:5. Mr. Lloyd further testified that he did not know if meeting minutes were kept for job meetings held about the repair and reconstruction work at the Verizon Building and he also testified that he did not know who from Verizon attended such meetings – if anyone. *See Id.* at 308:2 to 309:5.

Mr. Lloyd does not know who the team leaders were at the Verizon Building or who actually hired them. For example, Mr. Lloyd testified that he did not know if Tishman, as Verizon's general contractor, had a project manager or project superintendent for the Verizon Building. *See Id.* at 309:12 to 309:23. Additionally, Mr. Lloyd testified that he did not know if Verizon had a lead person assigned to coordinate the work among the clean-up contractors and the contractual construction contractors at the Verizon Buildings. *See Id.* at 310:14 to 311:20. Furthermore, Mr. Lloyd testified that he does not know who the demolition contractors were at the Verizon Building. He also testified that he does not know if the demolition contractors were hired by Verizon, Tishman or someone else altogether. *See Id.* at 319:20 to 320:3.

Addressing perhaps the key issue in this litigation, Verizon's proffered witness was unable to testify as to what personal protective equipment, if any, was used at the Verizon Building and does not know what contaminants the workers were warned about. For example, Mr. Lloyd testified that he does not know if the demolition contractors used personal protective equipment while performing their work. *See Id.* at 320:4 to 320:8. Additionally, Mr. Lloyd testified that he does not know if the contractors were informed of the contamination and contaminants found in the Verizon Building in September 2001. *Id.* at 322:17 to 322:24. Furthermore, Mr. Lloyd testified that he did not know if there was a specific site safety plan developed for the trade contractors with regard to the use of personal protective equipment given the contaminants found in the Verizon Building. *See Id.* at 322:25 to 323:7. Mr. Lloyd testified that he did not know if construction was still going on at the Verizon Building when Verizon determined that respirators were not needed at the Verizon Building. *See Id.* at 343:11 to 344:7. Mr. Lloyd also testified that he did not know if any contamination was found in the vents or ducts in 2002. *In fact, he testified that he did not even know if the vents and ducts were still there in 2002. See Id.* at 349:17 to 349:20.

As a result of not being at the Verizon Building and inadequate preparation, Mr. Lloyd was unable to identify and describe the work certain contractors were doing at the Verizon Building. For example, Mr. Lloyd testified that he does not know what contractors or construction trades were performing demolition work at the Verizon Building. *See Id.* at 431:2 to 431:6. Additionally, Mr. Lloyd testified that he did not know if Verizon brought in a security company to the Verizon Building. *See Id.* at 444:7 to 444:9. Furthermore, Mr. Lloyd testified that he does not know how long Tishman Construction, LVI, CES or PAR performed work at the Verizon Building. *See Id.* at 446:7 to 446:19. Mr. Lloyd also testified that he did not participate in Verizon's decisions as to whether or not protective equipment was necessary or unnecessary. *See Id.* at 453:14 to 455:4.

The testimony of a Rule 30(b)(6) designee "represents the knowledge of the corporation, not the individual deponents." *Great American Insurance Company of New York, et al v. Vegas Construction Co.,* 251 F.R.D. 534, 538 (D.Nev 2008). It is quite clear from Mr. Lloyd's testimony that he was incapable of testifying about Verizon's knowledge of the events that transpired at the Verizon Building following the collapses of the World Trade Center site.


&NapoliBern LLP
ATTORNEYS AT LAW

Verizon's designation of Christopher Lloyd was an attempt to avoid the truth on what actually went on at the Verizon Building.

The clean-up project at the Verizon building was a major project that lasted for years. Verizon has employees who were actually present at the Verizon Building during the project and are still employed by Verizon or are otherwise knowledgable about the relevant issues and facts, even if more than one person is required to testify about them all. These witnesses would be in a much better position to testify about the Verizon project than Christopher Lloyd. The duty to present and prepare a Rule 30(b)(6) designee goes beyond matters personally known to that designee or to matters in which that designee was personally involved. *Twentieth Century Fox Film Corp. v. Marvel Enterprises, Inc.*, 2002 WL 1835439 at *3. (S.D.N.Y. August 8, 2002). Since Verizon designated Mr. Lloyed as their Rule 30(b)(6) witness, Mr. Lloyd is expected to know everything that Verizon has knowledge of and not just what Mr. Lloyd's personal knowledge.. He was unable to testify with regard to any of the particulars of the remediation, repair and reconstruction because he was never part of those endeavors.

As an individual designated to be a corporation's witness for deposition, Mr. Lloyd was expected to have been prepared to give sufficient testimony about the subjects in Plaintiffs' deposition notice. By Mr. Lloyd's unfamiliarity with most of the documents and events at the Verizon Building, he was unable to provide Verizon's interpretation of documents. His deposition was intended to "provide [the corporation's] interpretation of documents" not to be referred to them. *Twentieth Century* at *3. This interpretation is necessary in order to make the deposition a meaningful one and to prevent the "sandbagging" of an opponent by conducting a half-hearted inquiry before the deposition but a thorough and vigorous one before the trial. *Id.* at *3. It is apparent that after two days of testimony, Verizon is trying to impede the Plaintiffs' opportunity to conduct meaningful discovery.

Verizon's designation and preparation of Christopher Lloyd as its Rule (30)(b)(6) witness has not been adequate. Mr. Lloyd's inability to provide relevant testimony over two days must be immediately rectified by either: (1) Verizon adequately preparing Mr. Lloyd for Verizon's continued Rule 30(b)(6) deposition so he can adequately testify about Verizon's knowledge of the topics outlines in Plaintiffs' deposition notice, which we believe is unlikely to occuror (2) Verizon preparing and producing a different witness for Verizon's continued Rule 30(b)(6), specifically, a witness or witnesses who have adequate knowledge of the relevant facts and topic areas and who are actually competent to testify about the topics in the Plaintiffs' deposition notice.


**&NapoliBern LLP**
ATTORNEYS AT LAW

### *Verizon's Position:*

The Napoli firm has approached the defendants' depositions as it has most other discovery obligations in this litigation — as an opportunity to further burden defendants and drive up expenses, in an apparent effort to leverage settlement. Plaintiffs' present letter is riddled with misrepresentations and misquotes regarding the two-day deposition testimony by Verizon's 30(b)(6) witness, Mr. Christopher Lloyd. But the letter's hyperbole aside, Mr. Lloyd's testimony speaks for itself, (*see* Exhibit A (June 7, 2012, Dep. Testimony) and Exhibit B (June 8, 2012, Dep. Testimony)), demonstrating that Mr. Lloyd was prepared to, and did indeed, testify adequately on information reasonably knowable to Verizon as a building-owner defendant, with respect to the subject matters noticed by plaintiffs. In fact, as discussed below, plaintiffs' purported need for a further day of deposition stems not from the adequacy of Mr. Lloyd's preparation and testimony but rather from the lack of preparation by their own examining attorney, Mr. Charles Nolet Jr. Mr. Nolet's unfamiliarity with both the discovery record in this litigation—particularly Verizon's past discovery responses and document production—left him unable to conduct a coherent examination. This failure, however, is not a valid basis to seek another deposition. Accordingly, Verizon respectfully submits that the Court should deny plaintiffs' current request in its entirety.

### *Plaintiffs' Deposition Notice and Verizon's Objections*

Contrary to the suggestion in plaintiffs' letter, Verizon promptly and appropriately responded to plaintiffs' Rule 30(b)(6) deposition notice. Three business days after receiving the notice, on April 16, 2012, Verizon, through its counsel, responded that it would make a corporate witness available for deposition on June 7 and 8, within days of the dates noticed. Plaintiffs confirmed without objection. In an effort to conform plaintiffs' otherwise-stock deposition notice to information reasonably knowable to Verizon as a building owner, Verizon served its objections and responses to the notice on June 1, (*see* Exhibit C), leaving the parties adequate time to meet and confer, if necessary, regarding the appropriate scope of the Rule 30(b)(6) examination. Plaintiffs never responded to Verizon's objections.

### *Verizon's Corporate Representative*

Mr. Lloyd, an executive director in Verizon's Policy and Corporate Responsibility department with nearly 30 years experience at the company, was a member of a group of employees from Verizon's Safety, Health and Environment organization mobilized on September 11, 2001 to help carry out Verizon's emergency-response procedures. (*See* Ex. A at 154:8-156:20.) As such, Mr. Lloyd was directly involved in Verizon's response to the emergency created by the terrorist attacks—a fact plaintiffs' letter conspicuously omits. Verizon's emergency-response procedures included immediately establishing and manning an Emergency Operations Center, or EOC, at 1095 Avenue of Americas, where specialists from Verizon's various organizations—including Mr. Lloyd and others from Safety, Health and Environment to Network Operations—could work together to coordinate Verizon's response to the damage caused by the World Trade Centers' collapse. (*See id.* at 156:6-20; 158:6-160:4 ("A. . . . We have it as a standing practice, if there is an issue, we open the emergency operation center . . . We have service level agreements that we need to meet and we need to keep. . . .").)


### &NapoliBern LLP
ATTORNEYS AT LAW

Mr. Lloyd arrived at Verizon's EOC on September 17, 2001, (*id.* at 165:5-12), where he worked to develop and update existing corporate safety policies so that Verizon employees could safely re-enter 140 West Street and assess and address the damage to the building and its critical telecommunications equipment. (*See id.* at 172:23-173:23.) Based on this experience, Mr. Lloyd testified at length regarding the EOC's role in Verizon's response:

> Q. Who is providing information about
> 12 conditions to the Verizon workers who are
> 13 onsite?
>
> 14 MS. STEVENSON: Objection; vague.
>
> 15 A. Which Verizon workers?
>
> 16 Q. The Verizon workers who were there
> 17 24 hours a day that you told us about.
>
> 18 A. Well, we had a variety of ways of
> 19 doing this. Initially, it was done by,
> 20 through the command center that we had set up
> 21 down there. We had safety, health and
> 22 environment employees there. As we developed
> 23 methods and procedures appropriate for the
> 24 conditions there, those would be conveyed to
> 25 the supervisors, and the Verizon employees
> 2 that had to work in the building.
> 3 And then later on in the week, we set
> 4 up a very comprehensive respirator testing and
> 5 fitting program over at 221 East 37th Street,
> 6 and we over the course of the remainder of
> 7 2001, we trained some 1800 employees to use
> 8 these respirators, and we trained them on the
> 9 general conditions that they would find at the
> 10 site; so that they were prepared to work in
> 11 that environment.

(*See id.* at 237:11-238:11.) This experience makes Mr. Lloyd uniquely qualified to respond to various topics in plaintiffs' deposition notice—including, in particular, Topic C, which asks for testimony regarding "[p]olicies and procedures . . . regarding the subject building as to the 9-11 clean up [sic] and/or decontamination; [sic] and including any safety plans and/or procedures . . . ." (Ex. C, at 5.)

Nonetheless, in addition to selecting a corporate representative with relevant work experience, Verizon went to great lengths to ensure that Mr. Lloyd was prepared to testify on the corporation's behalf pursuant to plaintiffs' Rule 30(b)(6) notice. Verizon arranged for Mr. Lloyd to travel from Washington D.C. to New York and New Jersey on several occasions to meet with counsel to prepare for his testimony. During these meetings, Mr. Lloyd reviewed hundreds of


### &NapoliBern LLP
ATTORNEYS AT LAW

---

records produced by Verizon regarding the remediation and restoration efforts at 140 West Street. (*See generally* Ex. A at 246:12-247:2.) He also traveled to 140 West Street to tour the Verizon building with company environmental specialists, including a specialist onsite in the days immediately following September 11, 2001. He held conferences with Verizon employees to discuss their personal knowledge of the site-specific projects carried out at 140 West Street from September 2001 through late 2003. (*See id.* at 148:22-153:23.) As demonstrated below, owing to these efforts as well as his own personal experience developing Verizon's emergency-response strategy and procedures, Mr. Lloyd was prepared to and, when permitted, did give adequate testimony based on Verizon's knowledge of the subject matters covered by plaintiffs' notice.

The fact that Mr. Lloyd was not physically present at 140 West Street during the clean-up work does not make him an inadequate 30(b)(6) witness. First, as the authority cited in plaintiffs' own letter makes clear, there is no personal-knowledge requirement for a corporate representative testifying pursuant to Rule 30(b)(6). *See Twentieth Century Fox Film Corp. v. Marvel Enters. Inc.*, Civ. No. 01-3016, 2002 WL 1835439, at *2 (S.D.N.Y. Aug. 8, 2002) ("'The testimony elicited at the Rule 30(b)(6) deposition represents the knowledge of the corporation, not of the individual deponents.'" (quoting *U.S. v. Taylor*, 166 F.R.D. 356, 361-62 (M.D.N.C. 1996))). And, as Mr. Lloyd made clear, his own experience in coordinating Verizon's response effort did give him personal knowledge on many issues discussed in plaintiffs' examination.

*Mr. Lloyd was Adequately Prepared to Testify as to Verizon's Knowledge*

Over the course of two full days of deposition, Mr. Lloyd endeavored to give complete, non-evasive answers to Mr. Nolet's questions on the topics listed in plaintiffs' notice. For instance, when asked about the structure of the Verizon building at 140 West Street, (Topic A), Mr. Lloyd testified adequately regarding both the building's basic architectural elements, (*see, e.g.*, Ex. A at 47:13-20 (completed in 1926); 53:4-6 (32 stories); 87:20-88:8 (1.2 million square foot); 137:22-138:6 (23 elevators in 5 banks)), as well as the building's core telecommunications elements:

> 5 Q. . . . Can you describe 140 West Street for
> 6 me?
>
> 7 MS. STEVENSON: Objection; vague.
>
> 8 A. So, 140 West Street is a switching
> 9 hub, primarily its function, it was built in
> 10 1926 to provide telecommunications services to
> 11 Lower Manhattan.
> 12 So that the primary function of that
> 13 building, it contained four digital switches
> 14 that provided basically the equivalent
> 15 telecommunications services to the City of
> 16 Cincinnati.
> 17 So, it served the Financial District,



**&NapoliBern LLP**
ATTORNEYS AT LAW

> 18 the stock exchange, all of the voice and data
> 19 communication services that provided, that
> 20 made the stock exchange go, ran through that
> 21 building.
> 22 It provided E-911 services. It
> 23 provided services to, you know, all of the
> 24 emergency response agencies in Lower
> 25 Manhattan, the police, the fire department, to
> 2 federal, state and local agencies. It was
> 3 primarily a switching hub.

(*Id.* at 52:5-53:3; 93:2-94:6 (describing the digital switches in 140 West as the "head" of lower Manhattan's telecommunications system).)

Mr. Lloyd also testified at length regarding the damage suffered by the Verizon building and its telecommunications equipment as a result of the terrorist attacks on September 11, 2001, (Topic D). For instance, Mr. Lloyd gave the following overview of that damage:

> 14 ... [S]o on the east side of the building, on the
> 15 exterior of our building on the east side on
> 16 Washington Street, the 7 World Trade Center
> 17 had come down and it slumped against the side
> 18 of our building, and the debris was seven
> 19 stories high.
> 20 Many of the windows on that side of
> 21 the building were gone, and there were holes
> 22 in the building façade on that side of the
> 23 building.
> 24 On the southern side of our building,
> 25 there was also damage associated with, you
> 2 know, the fall of the two Trade Center's
> 3 Towers; and that was also the side on the A
> 4 level where our cable vault was located, we
> 5 actually had a steel eye beam that pierced
> 6 through the building and went into the cable
> 7 vault. So that the exterior part of the
> 8 building was heavily damaged as a result of
> 9 this.
> 10 And then on the interior of the
> 11 building, you know, by virtue of all of these,
> 12 you know, the windows that were missing and
> 13 the holes that were in the side of the
> 14 building, we had a lot of debris, you know,
> 15 that was precipitated by the fall of the
> 16 Towers come into our building; and they were
> 17 compromising the switching, they were
> 18 compromising the emergency generators to the
> 19 point that basically by the evening of, by
> 20 about 7:00 on, you know, September 11th, we

**&NapoliBern LLP**
ATTORNEYS AT LAW

> 21 had, we no longer had any service from Con
> 22 Edison. All of our emergency generators had
> 23 shut down . . . .

(*Id.* at 180:4-181:23.) Additionally, he was prepared to testify as to the specifics of that damage. (*See, e.g., id.* at 183:23-184:19 (discussing specific damage to the Verizon building's telecommunications footprint).)

With respect to the emergency remediation and restorations projects at 140 West Street, Mr. Lloyd was adequately prepared to testify regarding the contractual relationship between Verizon, on the one hand, and the various contractors and subcontractors working in the Verizon building following September 11, 2001, on the other, (Topic B). For instance, Mr. Lloyd testified regarding Tishman Interiors Company's role as Verizon's general contractor for construction-related projects. (*See, e.g.,* Ex. B at 301:8-302:7.) He also described the role of Hillmann Environmental Group, the industrial hygienist contracted by Verizon to perform environmental testing and monitoring, (*see, e.g.,* Ex. A at 167:21-168:12), as well as the roles of Comprehensive Environmental Services, Inc., PAR Environmental, and LVI Environmental Services, Inc., the three primary abatement companies contracted by Verizon to remediate environmental issues potentially associated with the dust and debris brought into 140 West Street by the World Trade Centers' collapse. (*See, e.g., id.* at 250:14-251:24.) With respect to the former, Mr. Lloyd testified repeatedly that Verizon retained each of these companies on account of its expertise in the field of environmental abatement, and each company was expected to perform its work in accordance with applicable industry regulations and practices. (*See, e.g.,* Ex. B at 274:18-275:15.)

Similarly, Mr. Lloyd was adequately prepared to testify regarding the remediation and restoration efforts in 140 West Street, (Topic E). Mr. Lloyd was familiar with and testified generally regarding the nature of these projects, (*see, e.g.,* Ex. B 303:11-305:3 (describing varying approaches to restoring the building's HVAC systems and network equipment)), and the manner in which these projects progressed, (*see, e.g.,* Ex. A at 197:11-198:9 (describing initial focus on floors 1 through 9)). Mr. Lloyd also explained the importance of beginning these projects at 140 West Street without delay following the attacks of September 11, 2001:

> Q. Were any other Verizon employees from
> 3 the 140 West Street involved in that?
>
> 4 A. So, what happened on 9/11, the
> 5 building was evacuated. So, we had the first
> 6 nine floors of the building, 1 through 9 was
> 7 where the equipment resided. From floor 10 up
> 8 was all administrative space.
> 9 The people that were in the
> 10 administrative space left the building, and
> 11 many of them never returned until late 2003;
> 12 they were relocated to other places.
> 13 What then happened was, our focus was
> 14 on getting the switching systems restored in a

**EXHIBIT A**


**ATTORNEYS AT LAW**

```
15 safe and expeditious manner so that we could
16 return service to Wall Street, you know, as
17 was mandated by the federal authorities, the
18 FCC, the president, as the PSC in New York,
19 the governor.
20 So, our focus was all hands on
21 bringing the relevant personnel that could
22 work on the network equipment, the safety
23 specialists, and the real estate specialists
24 to assess and remediate and bring the building
25 back up on a temporary basis to provide
 2 service.
```

(*Id.* at 86:2-87:2.) As Mr. Lloyd further explained, many of Verizon's employees were focused on restoring the building's telecommunications equipment, while Verizon's contractor-specialists completed projects within their own fields of expertise. (*See, e.g., id.* at 252:7-25 ("[W]e hired [clean-up workers] because we're a telecommunications company. We weren't an asbestos — we weren't Verizon asbestos abatement company, we were Verizon Communications. We needed asbestos abatement expertise. So, we hired them because they were licensed to provide that expertise.").)

To be sure, there were questions that Mr. Lloyd was asked during the course of the two-day deposition that he could not answer. But these questions, in large part, fall into two categories. First, when asked date-specific or very detailed questions, Mr. Lloyd from time-to-time referred Mr. Nolet to documents from within Verizon's document production that would either contain those answers or assist him in answering plaintiffs' inquiry. (*See, e.g.,* Ex. A at 150:9-152:8 ("A. . . . I do know that there is a document that the real estate organization developed that provides a very detailed chronology of all of the steps that real estate took with respect to the restoration and remediation of 140 West Street, and I know that a lot of this information is documented in there."); 193:16-21 ("Q. You just told us about your plan. Is that plan reduced to writing? A. Yes, it was. I believe in the documents we produced for you, you can see the instructions we developed for our employees to work safely in this environment."); Ex. B. at 358:8-15 ("Q. From the time that you set up your respiratory training area though the end of October 2001, did you update any PPE methods and procedures? . . . A. Well, there's a document that we produced with respect to respirators and the specific requirements associated with that.").) As plaintiffs' letter concedes, a Rule 30(b)(6) deposition is not a memory test, and for questions requiring detailed information, it is entirely appropriate for a witness to refer the examining attorney to a document within the party's production that contains the information the attorney is seeking.

Second, in many instances, Mr. Lloyd's answers were appropriately limited by Verizon's knowledge of the remediation and restoration projects performed by Verizon's various contractors and their subcontractors—each of which is a separate, stand-alone corporate entity with its own specific plans, procedures, protocols, and work records. (*See, e.g.,* Ex. B 309:12-19 ("Q. Did Tishman as your general contractor have a project manager for 140 West Street? [Objections to term "general contractor"] A. I don't know. You'd have to ask Tishman."); *id.* at



**NapoliBern LLP**
ATTORNEYS AT LAW

283:6-20; *see generally* Ex. A at 175:13-176:17.) These answers do not reflect a lack of preparation; rather they simply reflect the scope of Verizon's knowledge of these numerous third parties' practices and procedures. For instance, as Verizon's general construction-related contractor, Tishman sub-contracted with dozens of specialists to complete innumerable restoration projects. Accordingly, as Mr. Lloyd indicated, certain project-specific questions are appropriately directed to Tishman—or more likely its subcontractors—rather than Verizon. (*See, e.g.*, Ex. B at 299:22-301:32; 340:4-16.) The same applies for certain questions regarding the remediation projects carried out by Verizon's environmental-abatement contractors. (*See, e.g.*, Ex. B at 278:4-16 (asking Mr. Lloyd who was on the management team of abatement contractors); Ex. A at 239:3-13.) In many of these instances, Mr. Lloyd merely referred Mr. Nolet's inquiry to the appropriate party—or, to say the same, the corporate entity with knowledge regarding that inquiry:

> Q. Did Verizon request and review
> 2 contractor's safety plans prior to permitting
> 3 them to work at 140 West Street?
>
> 4 MS. STEVENSON: Object to form, and
> 5 asked and answered.
>
> 6 A. Which contractors?
>
> 7 Q. The construction contractors.
>
> 8 MS. STEVENSON: Object to form.
>
> 9 A. So, the construction contractors that
> 10 were performing work at 140 West Street were
> 11 retained by Tishman. So, Verizon didn't
> 12 contract with them directly. So, I would ask
> 13 that question of Tishman.

(Ex. B at 330:25-331:13.)

Nonetheless, in order to manufacture the present dispute, plaintiffs' letter often resorts to misquoting, or mis-citing, Mr. Lloyd's deposition testimony. Indeed, plaintiffs' letter seizes on those areas of inquiry better addressed to Verizon's contractors as supposed indicia of Mr. Lloyd's unpreparedness. For instance, plaintiffs' letter asserts that Mr. Lloyd "does not know if the demolition contractors [who performed work in the Verizon building] used personal protective equipment while performing their work." But, as Mr. Lloyd testified, because Verizon did not supervise the demolition company—indeed, did not even directly contract with the demolition company—Verizon is not able to answer what protective equipment the demolition workers wore; the demolition company itself is best situated to answer plaintiffs' questions on this topic. (*See* Ex. B at 320:4-13.) Similarly, plaintiffs' letter complains that Mr. Lloyd was unfamiliar with specific safety procedures and methods used by the abatement companies working at 140 West Street. But, again, as Mr. Lloyd testified, these contractor


**ATTORNEYS AT LAW**

companies are the appropriate corporate entities to answer plaintiffs' questions in this regard. (*See, e.g., id.* at 291:17-291:23 ("Q. Do you know if the clean-up workers were fit-tested for respirator use at 140 West Street? A. I think you'd have to ask their employer.").) As a building owner, Verizon did not supervise the abatement contractors' employees or dictate what types of safety procedures the abatement contactors' should utilize. (*See, e.g., id.* at 283:6-20.) Mr. Lloyd provided detailed testimony regarding the respiratory training and protective equipment provided to *Verizon* workers, but repeatedly explained that the contractors working at 140 West Street were responsible for supervision and protective equipment of their own employees:

> 13 Q. Did anybody on behalf of Verizon
> 14 check on the type of personal protective
> 15 equipment being used by the clean-up
> 16 contractor workers?
>
> 17 MS. STEVENSON: Objection; asked and
> 18 answered.
>
> 19 A. It was the responsibility of the
> 20 abatement vendors to supervise the work,
> 21 provide them with the appropriate personal
> 22 protective equipment, and make sure that they
> 23 followed their procedures.

(*See id.* at 287:13-23; *see also* 289:10-291:23 (describing respirator training provided to Verizon employees, but explaining that contractors were responsible for respirator training of their own employees).) These answers will not change with a third day of deposition or a new witness; they are simply matters outside the knowledge of Verizon New York.

*Unpreparedness of Plaintiffs' Counsel*

Unfortunately, it was painfully obvious to all in attendance that, unlike Mr. Lloyd, plaintiffs' examining attorney, Mr. Nolet, had not spent the necessary time preparing for the deposition. From the deposition's outset, Mr. Nolet—who has never made an appearance in this ligation—demonstrated unfamiliarity with even the basic facts relating to the Verizon building and the various contracting parties working onsite following September 11, 2001. For instance, on numerous occasions, Mr. Nolet had not reviewed, let alone brought along as exhibits, basic documents produced by Verizon as a part of the discovery record. (*See, e.g.,* Ex. A 134:19-136:18 (Mr. Nolet claiming that Verizon had not produced the master contracts between Verizon and its three primary abatement companies, despite Verizon having produced them years ago); 147:24-148:5 (Mr. Nolet claiming that Verizon had not produced pre-September 2001 corporate safety plans, despite Verizon having produced them years ago); 104:7-21 (Mr. Nolet claiming that Verizon had not produced any post-September 2001 photographs of the Verizon building's interior, despite hundreds of such photographs having been produced by Verizon and its various contractors)). Indeed, at times Mr. Nolet had a hard time even recalling the address of the Verizon building. (*See id.* at 79:18-22 ("1040 West Street"); 137:22-26 (same).)

EMPIRE STATE BUILDING, 350 FIFTH AVENUE, NEW YORK, NEW YORK 10118 | (212) 267-3700

NAPOLIBERN.COM

**&NapoliBern LLP**
ATTORNEYS AT LAW

As a result of his lack of preparation, Mr. Nolet frequently turned to apparent delay tactics. Mr. Nolet spent significant portions of the first day of Mr. Lloyd's examination going through a check-list of names to determine whether the listed individuals were still employed by Verizon. (*See id.* at 75:8-85:2 (asking questions regarding the employment status of 10 current and former Verizon employees).) On other occasions, Mr. Nolet wasted inordinate portions of the examination on topics largely irrelevant to the claims in plaintiffs' cases, (*see, e.g., id.* at 18:21-37:24 (discussing the details of Mr. Lloyd's professional history, most of which far pre-dated September 11, 2001)), or re-examining Mr. Lloyd on topics already covered in the deposition, (*see, e.g., id.* at 100:4-101:8 (regarding frame equipment); Ex. B at 287:13-23 (regarding contractors' duty to check their employees' personal protective equipment); 287:24-288:3 (same); 330:25-331:24 (regarding contractors' site-specific safety plans).) And, by the end of the second day, Mr. Nolet had resorted to simply asking Mr. Lloyd the meaning of otherwise-unambiguous terms and phrases in summary reports prepared by various Verizon employees. (*See, e.g., id.* at 426:3-10; 410:22-411:3; 416:6-16.) This type of inquiry is neither probing nor productive, and Verizon's counsel repeatedly warned Mr. Nolet that his dilatory tactics should not be used as grounds for seeking additional deposition time with Verizon's witnesses. (*See, e.g.,* Ex. A 83:9-17.) Now plaintiffs are attempting to do just that.

*Plaintiffs' Unwillingness to Proceed in Good Faith*

In an effort to avoid burdening the Court with the present dispute, Verizon's counsel offered to meet and confer with the Napoli firm to determine whether there were specific topics they felt Mr. Lloyd had failed to fully address and offered to consider making an additional witness available in response. The Napoli firm was unable, or unwilling, to identify any specific areas, claiming that Mr. Lloyd was an inadequate witness in all respects and insisted on pursuing this joint letter process instead.

As the attached deposition transcripts make clear, the Napoli firm's request for an additional deposition of Verizon should be denied. Verizon has already made an adequately prepared corporate representative available for two full deposition days in response to all of the properly noticed topics, just as the Court's discovery order requires. Rhetoric aside, the Napoli firm has done nothing to demonstrate that there are specific areas within Verizon's corporate knowledge that plaintiffs haven't already had a full and fair opportunity to examine. Plaintiffs' counsel's failure to take advantage of that opportunity does not justify the requested relief.

\* \* \* \* \*

Respectfully submitted,

_____s/_____
Christopher R. LoPalo, Esq.
WORBY GRONER EDELMAN
& NAPOLI BERN LLP
*Plaintiffs' Attorney*


ATTORNEYS AT LAW

&

Respectfully submitted,

_____s/_____
Lee Ann Stevenson, Esq.
KIRKLAND & ELLIS LLP
*Attorneys for Verizon New York, Inc.*

Enclosure

Judge wrote:

'The variety of information that plaintiff wishes to cover causes a "30(b)(6)" procedure to be unsuitable. Defendant's counsel should provide plaintiff's counsel with the names of suitable witnesses for plaintiff to depose.

7-13-12

Alvin K. Hellerstein'