UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/13/12

-------------------------------------------------------------- x

IN RE WORLD TRADE CENTER DISASTER  :
SITE LITIGATION                                               :

--------------------------------------------------------------  :

IN RE LOWER MANHATTAN DISASTER     :
SITE LITIGATION                                               :

--------------------------------------------------------------  :

IN RE COMBINED WORLD TRADE CENTER  :
AND LOWER MANHATTAN DISASTER SITE  :
LITIGATION                                                      :

-------------------------------------------------------------- x

ALVIN K. HELLERSTEIN, U.S.D.J.:

**ORDER AND OPINION REQUIRING
CONTINGENT PAYMENTS TO BE
PAID TO SETTLING PLAINTIFFS**

21 MC 100 (AKH)
21 MC 102
21 MC 103

The issue on which I write relates to the City of New York's obligation, through its insurer, the WTC Captive Insurance Company ("WTC Captive"), to pay Contingent Payments, a category of payments under the parties' Settlement Process Agreement, As Amended ("SPA"). I hold that five million dollars was due and payable to the settling plaintiffs on January 20, 2012, and that the City and the WTC Captive breached the settlement agreement by failing and refusing to make the payment.

### I.    The Relevant Terms of the Settlement Process Agreement

The plaintiffs who chose to settle their claims against the City of New York ("City") and its contractors became eligible to receive three categories of payments. The Base Settlement Amount, the first category of payment—$625 million—became due and payable once the ratio of acceptances by plaintiffs reached 95 percent, and has been distributed among the settling plaintiffs according to which of four categories their proofs of claim fit into. Bonus Payments, the second category of payments—up to $62.5 million—became due and payable at the same time as the base payment, depending on

1

how many plaintiffs settled beyond the 95 percent acceptance ratio.[1]  Contingent

Payments, the third category of payments, up to $5 million per year, became due and

payable in each of the five years following the effective date of the settlement agreement,

beginning January 20, 2012, if the number of new claims against the City and its

contractors does not exceed a certain threshold, and if settlement payouts or

indemnification obligations also do not exceed a certain threshold.  Bonus Payments and

Contingent Payments, if due and payable, are payable to only Tier IV plaintiffs, those

most severely injured from their work at the World Trade Center.[2]

Section IV(A) of the SPA provides for Contingent Payments.  Contingent

Payments become due and payable depending on:

> i. The number of New Debris Removal Claims [that is, claims filed after the SPA cutoff date of April 12, 2010];
>
> ii. The amount of money, if any, paid by the WTC Captive [to pay judgments or settlements] of Debris Removal Claims by Plaintiffs who do not opt into [the settlement];
>
> iii. The amount of money, if any, paid by the WTC Captive [to indemnify settling defendants against loss or expense from claims by non-settling defendants].

SPA § IV(A).  Contingent Payments, "should they become due," are to be paid 15 days

after fixed annual dates, beginning one year after the Final Settlement Agreement

---

[1]  See In re World Trade Ctr. Disaster Site Litig., 834 F.Supp.2d 184 (S.D.N.Y. 2011) (ordering the WTC Captive to pay $55 million in bonus payments because 99.4 percent of eligible plaintiffs opted to settle) (hereinafter "Bonuses Opinion").  An appeal is pending.

[2]  The settling plaintiffs were assigned to four payment categories, or Tiers, according to the nature and severity of their injuries caused by the clean-up work they performed at the World Trade Center.  Tiers I to III received fixed amounts; Tier IV plaintiffs received larger and graduated amounts, reflecting the unique nature and degree of their injuries. Only Tier IV plaintiffs are eligible to receive Bonus and Contingent payments.

Effective Date—that is, one year after January 5, 2011. SPA § IV(B).[3] That day of

payment is defined as the Contingent Payment Date. If the "number of New Debris

Removal Claims Filed or Submitted to the City of New York as of [the] First Contingent

Payment Determination Date" is 120 or fewer, $5 million is due and payable to the Tier

IV plaintiffs. This $5 million amount is to be reduced by $50,000 for each new claim

above 120 filed at Year 1. This means that, if the New Debris Removal Claims number

220 or more, no Contingent Payment is due. SPA § IV(C)(i). In successive years, the

same formula applies, but the threshold of New Debris Removal Claims that triggers a

reduction in Contingent Payments rises—to 240 at Year 2, 360 at Year 3, 480 at Year 4,

and 600 at Year 5. SPA § IV(C)(ii)-(v). The amount can be further reduced by any

cumulative amount paid by the WTC Captive to opt-out plaintiffs and indemnified

defendants in excess of $7 million by Year 1, $14 million by Year 2, $21 million by Year

3, $28 million by Year 4, and $35 million by Year 5. SPA § IV(C)(i)-(v).

## II.   Claimants Who Opted Not To Settle, and New Debris Removal Claimants

Under the Settlement Process Agreement, as Amended, the claimants

eligible to settle had to have filed suit, or made formal claim against the City, on or

before April 12, 2010.[4] As of that bar date, of the approximately 10,000 in the group

eligible to settle under the SPA, fewer than one percent, only 85 plaintiffs, opted not to

settle and to continue with their cases – a positive settlement response percentage of 99.4

---

[3] The Final Settlement Effective Date was January 5, 2011. Thus, the first of the
Contingent Payments, if due and payable, was due and payable on January 20, 2012, one
year and 15 days after the Final Settlement Effective Date. The Second, Third, Fourth
and Fifth anniversary payments would be due and payable two, three, four and five years,
respectively, after January 20, 2011.
[4] SPA § VI(A).

3

per cent.[5]  (At present writing, only one case of the 85 remains for completion of
discovery and trial; the rest have settled or have withdrawn their claims.)

      The claims against the City filed (or submitted to the City) after April 12,
2010 are called New Debris Removal Claims, and the number of such claims dictates the
amount of contingent payments due.  All parties agree that between the bar date of the
settlement and the First Contingent Payment Date, between April 12, 2010 and January 5,
2012, 260 claims against the City were noticed to the City or filed with the Clerk.  Of
these, however, the majority were withdrawn, were dismissed for want of prosecution, or
expired (if they were notices of claim) prior to January 5, 2012, leaving a number of live
cases well below the 120 threshold.[6]  The filings and the dismissals were the
consequences of two unique legislative acts, by New York State and by Congress.

      The statute of limitations for torts in New York requires a lawsuit to be
filed three years from the date the injury was discovered, or from the date the injury
should have been discovered.[7]  Lawsuits against the City have a shorter statute of
limitations.  A plaintiff must first file a claim with the City Comptroller within 90 days
after the date on which the claim arose; he then must give the City 30 days to respond;
after 30 days and once a claim is rejected, he must file suit within one year and 90 days of
the date on which the injury arose.[8]  But by special legislation enacted September 16,

---

[5] Bonuses Opinion, 834 F.Supp.2d at 193.

[6] The exact number of New Debris Removal claims active as of January 5, 2012 is in
dispute.  According to the documents filed by the defendants, 57 (or perhaps 58) cases
remained active as of January 5, 2012.  Both sides agree that the number of New Debris
Removal Claims alive as of January 5, 2012 is well below the 120 threshold.

[7] N.Y. C.P.L.R. § 214-c (three years from "the date of the discovery of the injury . . . or
from the date when through the exercise of reasonable diligence such injury should have
been discovered . . ., whichever is earlier.").

[8] N.Y Gen. Mun. L. § 50-e; N.Y Gen. Mun. L. § 50-i(1).

4

2009 ("Jimmy Nolan's Law," named for a 9/11 claimant who otherwise would have been barred from suing), New York enlarged the time for World Trade Center recovery workers to sue until September 16, 2010.[9] As a direct result, between September 13 and 16, 2010, approximately 300 new complaints were filed.[10]

From the very beginning, it was clear to me that most plaintiffs in this flurry of filings were not at all interested in prosecuting their lawsuits. However, not knowing plaintiffs' real intentions, I treated the lawsuits as real. I first dismissed a number of them for legally insufficient pleadings, under Rule 8, Fed. R. Civ. P., because their allegations were vague and conclusory, and because they named scores of defendants without allegations showing their alleged liability.[11] Some were re-alleged in amended pleadings, but, as will soon be discussed, plaintiffs were not interested in their court suits. Indeed, counsel asked me to stay further proceedings to await congressional events.[12]

The James Zadroga Bill (named for a police officer who died in 2006 of respiratory illness said to have resulted from his work at the World Trade Center after 9/11) was special federal legislation re-introduced in Congress on February 4, 2009 that provided for the re-opening of the Victim Compensation Fund ("VCF"), in order to compensate sick 9/11 cleanup workers. As of September 16, 2010, the Zadroga Bill was stalled in Congress, having failed a House vote on July 29, 2010.[13] Many claimants, their

---

[9] N.Y Gen. Mun. L. § 50-i(4).

[10] See General Order Sua Sponte Dismissing Complaints, In re World Trade Ctr. Disaster Site Litig., Doc. No. 2214 (S.D.N.Y. Oct. 14, 2010) (discussing case filings).

[11] Id. (dismissing 290 complaints).

[12] Transcript of Feb. 2, 2011 Status Conf., In Re: World Trade Ctr. disaster Site Litig., 21 MC 100, Doc. No. 2359 at 40-48 (S.D.N.Y Feb. 16, 2011).

[13] http://www.govtrack.us/congress/bills/111/hr847 (last visited July 12, 2012).

5

interests having been whetted, felt compelled to commence litigation before their claims were time-barred.

As short while later, Congress took up Zadroga again, and this time passed it, on December 22, 2010. It was signed into law by President Obama on January 2, 2011.[14]

The new federal law, similar to the old VCF, provided that claimants could not take part in both the reopened VCF and court litigation. The final regulations implementing the reopened VCF required plaintiffs to withdraw any lawsuit, by January 2, 2012. [15] It was by this date, then, that plaintiffs had to elect whether to file with the VCF or continue to prosecute their claims in this Court.

But even well before the VCF claim cutoff date of January 2, 2012, the plaintiffs showed little interest in staying in court. Both plaintiffs' and defendants' counsel advised me, as early as February, 2011, that many, probably most, of the newly-filed claims would be withdrawn voluntarily, as soon as the VCF would open for business pursuant to published regulations and accept claims. As James Tyrrell, defendants' liaison counsel put it, speaking also for plaintiffs' liaison counsel, the goal of the plaintiffs was not to proceed with lawsuits, but to "figure out what the Zadroga regs means" and, once they did, to "opt in [to Zadroga]."

> **[Defendants' Liaison Counsel] Mr. Tyrrell:** My guess is lots of [these new plaintiffs] now that Zadroga is available will opt for that. I don't see a whole lot of people there who say, you know, "absolutely, I want my day in court" on this issue or they would have filed five years ago, probably.
>
> **The Court:** I think you are right.

---

[14] Id.; 111 P.L. 347.
[15] 28 C.F.R. 104.61(b).

> **Mr. Tyrrell:** So, if I was a gambling person I would say the very high percentage of new cases are likely—when they figure out what the Zadroga regs means—are going to opt-in [to Zadroga] now.

Transcript of Feb. 2, 2011 Status Conf., In Re: World Trade Ctr. disaster Site Litig., 21 MC 100, Doc. No. 2359 at 45-46 (S.D.N.Y Feb. 16, 2011).

And this is what occurred.  Once I lifted the stay on the post-April 12 cases in October 2011, indicating that I would soon order rigorous discovery obligations to court-ordered interrogatories,[16] and as the Zadroga cutoff date approached, the cases began to be dismissed, about as quickly as they had been filed—the vast majority voluntarily dismissing over the course of a few days in mid-December, 2011.[17]  As of the case management conference held January 9, 2012, the week following the January 2, 2012 election date provided by the VCF regulations, defendants' liaison counsel announced that only 57 cases remained open, of those that had been filed after April 12, 2010.[18]  As of the most recent status conference, May 23, 2012, only 28 or 29 cases remained.[19]  And only one case remains from those plaintiffs who opted out of the settlement.

---

[16] Transcript of October 18, 2011 Status Conf., In re World Trade Ctr. Disaster Litig., 21 MC 100, Doc. No. 2598, at 23-31, 35 (S.D.N.Y Jan. 12, 2012).

[17] By one stipulation, for example, 49 cases were proposed to be dismissed.  Stipulation of Voluntary Dismissal, In re World Trade Ctr. Disaster Litig., 21 MC 100, Doc. No. 2669 (S.D.N.Y Dec. 14, 2011).

[18] Transcript of January 9, 2012 Status Conf., In re World Trade Ctr. Disaster Litig., 21 MC 100, Doc. No. 2729, at 7 (S.D.N.Y Jan. 12, 2012).

[19] Transcript of May 23, 2012 Status Conf., In re World Trade Ctr. Disaster Litig., 21 MC 100, Doc. No. 2834, at 2,6 (S.D.N.Y May 25, 2012).

III.    **The WTC Captive Breached its Contract Obligation to Pay**
        **Contingent Payments.**

The Settlement Process Agreement, As Amended, provided for a Base

Payment of $625 million, Bonus Payments of up to $62.5 million, and five years of

Contingent Payments of up to five million dollars per year.[20]  This opinion deals with the

Contingent Payments.

Under the SPA, the first of five Contingent Payments of five million

dollars each was due if, as of the first Contingent Payment Date, January 5, 2012, "the

number of New Debris Removal Claims filed or submitted"[21] was "120 or less."[22]  The

Contingent Payment, if due, was payable by the WTC Captive 15 days later, by January

20, 2012.[23]

Thus, the critical date for counting newly filed or submitted claims was

January 5, 2012.  Obviously, a claim that was withdrawn or dismissed on the merits prior

to the critical date, prior to January 5, 2012, is not a claim to be counted.  It may be found

in the file, but it is no longer a claim to be reckoned with.  The dismissed claim perhaps

may have a historical interest, but it is no longer of practical interest to parties or litigants.

The claim died with its dismissal, for a dismissed claim on the merits—and all the

dismissed claims were dismissed with prejudice—cannot be brought again.  Since it is no

longer a live claim, the WTC Captive is wrong to count it as such.

---

[20] See Section I, supra.

[21] SPA § IV(A)(i).

[22] SPA § IV(C)(i).  A second and third factor in relation to Contingent Payments—money
spent by the WTC Captive to discharge judgments and settlements, and to indemnify
defendants against loss or expense from claims by non-settling defendants—are not
relevant to the issue of the first Contingent Payment.  The WTC Captive has not asserted
these factors as reasons not to pay.

[23] SPA § IV.B.

8

As I wrote in my opinion that ordered the WTC Captive to pay Bonus Payments because of a 99.4 percent acceptance ratio, "a contract is to be understood in relation to the manifest intention of the parties." Four Seasons Hotels v. Vinnik, 127 A.D.2d 310, 317 (N.Y. App. Div. 1st Dep't 1987). The understanding of the Tier IV plaintiffs, those suffering the most serious illnesses by their work at the World Trade Center site after 9/11, is key. They, as I wrote, were the plaintiffs who would benefit from Bonus and Contingent Payments, and their willingness to accept the settlement presented the most urgent need for the City and its captive insurer, for their cases presented the greatest potential for large jury awards against the City.

The settlement, described in an Official Overview published and distributed by the WTC Captive, promised to pay plaintiffs "between $625 million and $712.5 million,"[24] a range that reflected the availability of Bonus Payments and Contingent Payments to the Tier IV plaintiffs, as well as a $625 million base payment to be distributed to all four settling Tiers. The Tier IV plaintiffs had a reasonable right to expect Bonus Payments and Contingent Payments if the rate of acceptance of the settlement was sufficiently high, and the number of later-appearing suitors was sufficiently low. The opportunity for Bonus and Contingent Payments was part of the consideration to induce the seriously injured plaintiffs to give up their lawsuits and agree to the settlement.[25]

The City and the WTC Captive realized their expectations from the Contingent Payment feature. Their purpose was to keep enough money in reserve and

---

[24] Overview of the WTC Lit'n SPA, As Amended, ¶ I.  By separate order, the Overview is being placed in the court files.

[25] See the discussion in my Bonuses Opinion, 834 F.Supp.2d 184.

9

protect against exposure from people who might file lawsuits after the bar date of the settlement, after April 12, 2010. A lawsuit filed but unprosecuted and voluntarily dismissed is not a claim that adds to the City's exposure. Only a newly-filed claim that persists after the Contingent Payment date creates exposure.

I hold that a Contingent Payment of five million dollars was due from the WTC Captive on January 5, 2012, and was payable January 20, 2012.

## IV. In Fairness as well as Right, and Pursuant to the Court's Supervisory Authority, Contingent Payments Are Due and Payable.

This Order, that the WTC Captive pay Contingent Payments, arises not from any motion, but sua sponte, although with adverse briefing and argument by both sides. The WTC Captive objected to making Contingent Payments (as it did with Bonus Payments), contending that the Court lacks power to interfere with a private settlement in a non-class action litigation. The same objection is the basis of the appeal noticed by the City and the WTC Captive from my Order requiring the payment of Bonus Payments. For the reasons I expressed in my opinion supporting the order for the WTC Captive to pay Bonus Payments, the objection to the Court's exercise of supervisory jurisdiction to monitor and review the settlement is without merit.[26]

As I reasoned in my order requiring the City and the WTC Captive to pay Bonus Payments, the settlement was an aggregate settlement, for an aggregate price, not 10,000 individual settlements of 10,000 individual cases.[27] The settlement was made not with individual plaintiffs, but with Worby Groner Edelman and Napoli Bern LLP ("Worby Groner"). Worby Groner agreed to the settlement, in its capacity as counsel and

---

[26] Id. at 196; See In re Zyprexa Prods. Liab. Litig., 451 F.Supp.2d 458 (E.D.N.Y. 2006).

[27] Bonuses Opinion, 834 F.Supp.2d at 196.

10

liaison counsel for all plaintiffs, but without advance authorization from any of them. It undertook to offer the settlement, in all its complications, spread over 104 pages, and another 144 pages of exhibits, en masse, to all 10,000 plaintiffs, on a take-it-or-leave-it basis, subject to a 95 percent threshold of acceptances, reflected by execution of agreed releases and covenants, before the settlement could become effective. Although judicial approval was not sought, plaintiffs' and defendants' counsel considered it critical, for they improved the settlement terms to overcome an order of judicial disapproval and to obtain my determination that the settlement, as amended, was fair and reasonable.[28]

The position taken by the WTC Captive, to refuse to pay Contingent Payments because of a sophistical counting of dismissed cases, is unfair (as well as a contractual breach). The dismissed cases do not expose the City or the WTC Captive to loss, liability, or expense, and should not be counted in determining if Contingent Payments should be made. Indeed, the exposure of the City and the WTC Captive from all remaining cases against the City is relatively small; there is, at this writing, but one remaining case that opted out of the settlement, and but twenty-some cases that were filed after the settlement and that remain in pre-trial discovery and await settlement or trial. Of the billion dollars contributed by the Federal Emergency Management Agency to the WTC Captive to insure the City (and, indirectly, its contractors), several hundreds of millions of dollars remain, for no purpose whatever except to insure the City against the possibility of additional liability, loss, or expense arising from cases not yet brought that

---

[28] Transcript of March 19, 2010 Status Conf., In re World Trade Ctr. Disaster Litig., 21 MC 100, Doc. No. 2037, at 51-64 (S.D.N.Y April 2, 2010) (expressing disapproval of first settlement agreement); Order Approving Modified and Improved Agreement of Settlement, In re World Trade Ctr. Disaster Site Litig., 21 MC 100, Doc. No. 2091 (S.D.N.Y. June 23, 2010).

11

relate to the terrorist-related aircraft crashes into the World Trade Center on September 11, 2001, eleven years ago. There is little probability of any residue of substantial exposures, even allowing for relatively long gestation periods of some cancers, and even assuming that an etiology will be found to link such cancers to work performed at the World Trade Center in the eight months after September 11, 2001. The WTC Captive has realized the benefits of its settlement bargain; there is very little exposure remaining, particularly in light of the existence of a renewed Victims Compensation Fund; and the WTC Captive has no good excuse not to pay all components of the settlement bargain it made, including the Contingent Payments feature of that bargain.

There is another justification for the court's supervisory involvement in this issue. An effect of the Contingent Payment provision is to incentivize the attorneys for the plaintiffs, Worby Groner (and others) not to accept new clients for new cases. (The incentive could not have been aimed at the settling plaintiffs, for they had no relationship to those who had not previously filed claims but who might now be interested to consider a filing.) By giving Worby Groner an expectancy of fees from Contingent Payments—a six million to eight million dollar expectation[29]—defendants hoped to discourage the firm from bringing new suits.

---

[29] Twenty-five per cent of $25 million comes to $6,250,000; one-third, $8,333,333. I disapproved the first settlement agreement as inadequate, and advised Worby Groner that I would not approve a fee of one-third, even though that amount was reputedly expressed in their retainer agreements, and constituted Worby Groner's expectation from all facets of the settlement. Worby Groner then "voluntarily" reduced their contingent fee to 25 percent, and I approved the amended settlement based on that improvement, and an additional $50 million added by the WTC Captive, and the forgiveness of liens by the City and many other insurers. See Order Approving Modified and Improved Agreement of Settlement, In re World Trade Ctr. Disaster Site Litig., 21 MC 100, Doc. No. 2091 (S.D.N.Y. June 23, 2010).

12

It is unprofessional for a law firm to accept a payment contingent upon its refusal to represent future clients who seek its expertise,[30] and it is improper for an adverse party to make such a payment in order to decrease its liability. The contingent payment provision creates such a bargain, for it leads to the same result. The contingency provision pretends it is only *affected by* the WTC Captive's potential future liability exposure. But below its neutral language, it conceals its own insidious power *to actively affect* and reduce such liability exposure by incentivizing lawyers to refuse new clients who seek their expertise. As such, the architects of this provision should not be allowed to benefit from it. The WTC Captive should pay the full five million dollar Contingent Payment. And the plaintiffs' attorneys shall not receive fees from it. They have not earned a fee, and their fee of 25 percent of the Base Payment of $625 million is more than sufficient reward for the work they performed and the benefits they achieved.

## V. Conclusion

I hold that the settlement consideration of five million dollars was due and payable by the WTC Captive to the Tier IV plaintiffs on January 20, 2012. I hold, further, and as I did in my order requiring Bonus Payments to be paid, that plaintiffs'

---

[30] "A lawyer shall not participate in offering or making . . . an agreement in which a restriction on a lawyer's right to practice is part of the settlement of a client controversy." N.Y. R. Prof. Conduct R. 5.6(a). This provision prohibits "a lawyer from agreeing not to represent other persons in connection with settling a claim on behalf of a client." *Id.*, N.Y. State Bar Assoc. Comment 2. A major rationale for this rule is to ensure that the public has access to attorneys with the best expertise and talent. "Restrictions which somehow interfere with or restrict the freedom of present or future clients to hire and fire lawyers are what the rule aims to prohibit." Cohen v. Lord, Day & Lord, 75 N.Y.2d 95, 108 (1989). Additionally, the American Bar Association has opined that this rule applies not only to explicit limitations on practice, but to other indirect restrictions. See John K. Villa, Practice Restrictions in Settlement Agreements, ACC Docket, June 2007, at 88 (http://www.wc.com/assets/attachments/practice_restrictions_in_settlement_agreements. pdf) (citing American Bar Association ethics opinions).

counsel may not receive a fee for this consideration. The Clerk shall enter judgment

accordingly, with interest. Payment shall be made to the Allocation Neutral, the

Garretson Resolution Group, for distribution according to the SPA.


       SO ORDERED.

Dated:      July **13** 2012
            New York, New York

                                     ALVIN K. HELLERSTEIN
                                     United States District Judge

14