UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------X

IN RE:  WORLD TRADE CENTER LOWER
MANHATTAN DISASTER SITE LITIGATION

IN RE:  COMBINED WORLD TRADE CENTER
LOWER MANHATTAN DISASTER SITE
LITIGATION (straddler plaintiffs)

------------------------------------------------------X

21 MC 102 (AKH)

21 MC 103 (AKH)

---

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS CERTAIN PLAINTIFFS' CLAIMS WITH PREJUDICE FOR VIOLATING ESTABLISHED DISCOVERY PROCEDURES AND REGULATIONS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 37**

---

Richard E. Leff
McGIVNEY & KLUGER, P.C.
80 Broad Street, 23rd Floor
New York, New York 10004

## PRELIMINARY STATEMENT

The Defense Liaison Counsel ("DLC") in the above-captioned matter moves this Court pursuant to Rule 37 of the Federal Rules of Civil Procedure for an Order holding Plaintiffs in contempt of court for violating the discovery procedures and regulations as established by this Court and entering sanctions against Plaintiffs by dismissing Plaintiff's Cristhian Tapia[1] and Seweryn Wojciechowski[2] from this litigation, allowing the DLC to replace the selections of Mr. Tapia and Mr. Wojciechowski for expedited discovery, and any other relief this Court deems fit in the interest of justice. In the alternative, Plaintiff's should be precluded from amending or supplementing their alleged TCDI injuries or Tier-designation status and precluded from submitting evidence of any alleged injury other than that already identified and disclosed unless accompanied by a recent diagnosis.

## STATEMENT OF FACTS

This mass-tort litigation arises out of the September 11, 2001 terrorist attacks on New York City. In order to manage the tens of thousands of cases subsequently consolidated before Your Honor in the Southern District of New York, this Court initially created three master dockets: 21 MC 100, 21 MC 102 and 21 MC 103 to organize and differentiate between the varied claims.

### A. The Establishment of the TCDI Database

Following the establishment of court-ordered Core Discovery questions to be answered by all parties, it quickly became apparent that the voluminous amount of information being produced, although necessary to properly adjudicate the docket,

---

[1] Civil Action No. 08-cv-02248
[2] Civil Action No. 08-cv-02319

threatened to overwhelm these proceedings. Recognizing the need to efficiently advance the dockets, while also considering "the intense time pressures governing production," this Court pursuant its Order of March 21, 2008, approved the retaining of Technology Concepts & Design, Inc. ("TCDI") "to build, maintain and operate a database, to store the Core Discovery that the parties have begun to produce, and will continue to produce."[3]

The creation of an independent database was deemed an essential and crucial mechanism "to process and organize the information on a consistent, reliable, and accessible basis" where the Court and all litigants will have "a common basis to deal with the many and complex issues that regularly arise as this immense and important litigation proceeds."[4] Without such a database, "the approximately 10,000 cases…will become increasingly difficult to manage. Disputes will proliferate, and progress will be slowed. Depositions and other discovery will become necessary, as each side tries to prove facts that their separate databases treat in different ways. The cases will take years longer to progress towards trial or resolution."[5]

With the Court's intrinsic desire to improve the coordination and clarity of information being provided, the TCDI database was designed to be a central repository through which the Court, Special Masters, and all litigants would be able to "align plaintiffs readily with the particular defendants against whom they may have a basis to seek recovery, categorize plaintiffs according to their types and severity of injuries, eliminate various defendants from various cases, identify the sequence in which cases

---

[3] Order, *In Re: World Trade Center Lower Manhattan Disaster Site Litigation*, 21 MC 100 (AKH), 2008 U.S. Dist. LEXIS 23818 at *18 (S.D.N.Y. March 21, 2008). A copy of the Order is annexed to the Declaration of Richard E. Leff, Esq. ("Leff Decl.") as Exhibit A.
[4] *Id.* at 19.
[5] *Id.* at 22.

should be tried, group those cases with others that appear to be similarly situated...and, not least, create paradigms that could lead to settlements."[6]

## B. Certification of Core Discovery Responses Sworn As True

To further ensure validity and constancy, this Court - determined to avoid the previous difficulties in the collection and submission of information proffered during discovery in the initial 21 MC 100 docket - has "insisted throughout this process that answers be sworn to as true."[7] The inherent importance of certifying Plaintiff Core Discovery responses was originally pursuant to this Court's Order of August 29, 2011,[8] requiring each Plaintiff to personally swear to his or her interrogatory responses pursuant to Rule 33 of the Federal Rules of Civil Procedure ("Rule 33") "separately and fully under oath,"[9] and to swear these answers as being "true and correct."[10]

Any changes to the "data fields" whereby Core Discovery responses would be entered into the TCDI database were to be treated as amendments to Core Discovery itself, and would require proper adherence to rules governing timely supplementation.[11] When Plaintiffs requested these certification requirements be eased, this Court reiterated and confirmed in its Order dated September 28, 2011, that where consistent with Rule 33, each interrogatory must be answered "separately and fully in writing under oath."[12]

---

[6] *Id.* at 20.
[7] Transcript of Record at 17-18, *In Re: World Trade Center Lower Manhattan Disaster Site Litigation*, 21 MC 102 (AKH) (S.D.N.Y. October 11, 2012). A copy of the Transcript of Record is annexed to the Leff Decl. as Exhibit B.
[8] *See* Order, *In Re: World Trade Center Lower Manhattan Disaster Site Litigation*, 21 MC 102 (AKH) (S.D.N.Y. August 29, 2011), ECF No. 4080. A copy of the Order is annexed to the Leff Decl. as Exhibit C.
[9] *See* Fed. R. Civ. P. 33.
[10] *See* 28 U.S.C. § 1746.
[11] *See* Exhibit B at 17-18,
[12] *See* Order, *In Re: World Trade Center Lower Manhattan Disaster Site Litigation*, 21 MC 102 (AKH) (S.D.N.Y. September 28, 2011), ECF No. 4113. A copy of the Order is annexed to the Leff Decl. as Exhibit D.

In its November 8, 2011 Order, the Court once more clearly stated the necessity of Core Discovery submittals (via TCDI) to be accompanied with certification supported by an official oath or sworn to under penalty of perjury.[13] To ensure complete clarity, the Court quoted the necessary language verbatim within its Order as provided under 28 U.S.C. §1746.[14] The Court further stated that a certification which did not conform to the quoted language was *not* substantially equivalent, would treat such declarations as improper, and be summarily rejected. Plaintiffs failing to properly certify their responses were to show cause by November 18, 2011, stating why their cases should not be dismissed for failure to prosecute.

The direct consequence for those Plaintiffs ignoring these repeated Orders and failing to certify their Core Discovery Responses was a *sua sponte* Order dated December 8, 2011, whereby this Court dismissed with prejudice the claims of 170 Plaintiffs who had failed to certify their Core Discovery responses by this Court's final deadline of November 14, 2011; following the previous granting of four (4) separate extensions of time to allow for the submittal of properly certified replies.[15]

When in the process of selecting cases and building locations for Group II discovery, this Court once again warned Plaintiffs would be "precluded from using any information other than that which is in the sworn data" within the TCDI database "or for

---

[13] *See* Order, *In Re: World Trade Center Lower Manhattan Disaster Site Litigation*, 21 MC 102 (AKH) (S.D.N.Y. November 8, 2011), ECF No. 4129. A copy of the Order is annexed to the Leff Decl. as Exhibit E.
[14] *See* 28 U.S.C. § 1746.
[15] The Order dated December 8, 2011 is currently on appeal to the Second Circuit under docket number 12-87. Defendants further identified 132 other Plaintiffs who also failed to follow this Court's Orders to certify Core Discovery responses. Of these 132 Plaintiffs, 101 voluntarily dismissed their actions. As for the remaining 31 Plaintiffs, by motion dated January 11, 2012, and following oral arguments on July 23, 2012, this Court dismissed these 31 cases, pursuant to its July 25, 2012 Order. Plaintiffs' subsequent Rule 60(b) motion to reconsider the Court's dismissal regarding 22 of the 31 Plaintiffs was denied entirely in a decision filed October 22, 2012.

any other purpose."[16] Any new, altered, or consequent information would require "timely supplement[s]" as determined by when parties were either made aware, or should have been made aware of the need for such amendments.[17] This Court, having a "vested interest in the reliability and integrity of the court process" and recognizing "the answers that are given to the TCDI are the answers that everyone will rely on" reasserted the need for TCDI to be a "fixed field; [with] reliable, integral information on which everyone can rely."[18]

The need to have stable, coherent and fixed fields required "every piece of information in the TCDI database [to be] the basis of someone swearing it as true."[19] The need for continuity and accuracy was deemed important enough whereby this Court explicitly encouraged the filing of any motions before it if there was a sudden "wholesale list of change[s]" to the TCDI database. The Court warned, "[I]f the information proves not to be reliable, then there could be much more serious sanctions."[20]

### C. Selection Process of Group II Plaintiffs

The determination of Group II Plaintiffs for expedited discovery entailed the selection of thirty (30) litigants, with Plaintiffs' counsel selecting the first ten (10) Plaintiffs, followed thereafter by the Defendants selecting ten (10) Plaintiffs, and finally by the Court selecting ten (10) Plaintiffs.[21] The purpose of the segmented selection process was to facilitate the disparate goals of the varied parties and to allow for a greater understanding of the various claims within the overall docket. The importance of the

---

[16] *See* Exhibit B at 17.
[17] *Id.* at 17-18.
[18] *Id.* at 18-19.
[19] *Id.* at 19.
[20] *Id.*
[21] *Id.* at 20-22.

TCDI database to all parties in anticipation of selection for Group II discovery was made

inherently clear by this Court in its October 22, 2012 Opinion and Order:

> The purpose of the core discovery program was to bring all cases forward simultaneously, to allow counsel for plaintiffs and defendants, and the court and the special masters, to work with a common core of knowledge to select sampled cases for intensive deposition discovery, trials and negotiations of settlements. Truthful and reliable information was necessary about each plaintiff, about the buildings in which they worked, when and for how long they worked, the type of work they did, the doctors who treated them, the injuries they suffered, and their prior medical histories. And each plaintiff had to give this information consistently, reliably, and under oath, as with all relevant evidence. The information was to be provided according to strict time schedules so each stage could be completed and become the reliable basis for the next stage of pre-trial proceedings.[22]

The Defendants and Special Masters relied on the validity of the TCDI database

entries in order to accurately determine which Plaintiffs should be selected. As a result,

all decisions were heavily predicated on the accuracy and reliability of the data provided

within TCDI in order to create a diverse selection of Plaintiff cases for discovery.

## D. Discovery Related to Plaintiff Cristhian Tapia

Your Affirmant reviewed the Core Discovery responses, TCDI entries and

medical records for Plaintiff Cristhian Tapia. Following this review, McGivney & Kluger

prepared a deficiency letter dated January 17, 2013 to the firm of Worby Groner Edleman

& Napoli Bern, LLP ("Napoli") listing all discrepancies and corrections necessary in Mr.

Tapia's Core Discovery responses, as well as requesting missing medical authorizations

and records necessary to proceed with depositions and discovery.[23]

---

[22] *See* Opinion and Order Denying Motions to Reinstate 22 Dismissed Plaintiffs, *In Re: World Trade Center Lower Manhattan Disaster Site Litigation*, 21 MC 102 (AKH) (S.D.N.Y. October 22, 2012), ECF No. 4502. A copy of the Order is annexed to the Leff Decl. as Exhibit F.
[23] A copy of McGivney and Kluger's deficiency letter, dated January 17, 2013, is annexed to the Leff Decl. as Exhibit G.

In a response letter dated February 21, 2013, Napoli provided duly executed authorizations for various medical facilities as well a Certification (dated January 24, 2013) executed by Mr. Tapia averring to changes made to his original Core Discovery responses and entries in the TCDI database.[24] The response letter listed a number of changes to locations and hours worked as well as "amendments to Mr. Tapia's diagnoses and testing...based upon medical records, copies of which are included."[25] More specifically, the TCDI changes (made as of February 15, 2013) indicate Mr. Tapia – who was initially selected by the Defendants in part due to his status as a Tier 2 Plaintiff – now alleges injuries not previously disclosed including Esophageal Reflex (Tier 2) and Asthma, a new Tier 4 designated injury.[26]

Prior to Mr. Tapia's selection, a total of approximately fourteen (14) pages of medical records had been made available by Plaintiff's counsel.[27] Able to utilize and analyze only the information provided, the DLC selected Mr. Tapia as a Tier 2 Plaintiff. Only after Mr. Tapia's selection as a Group II Plaintiff were approximately 100 pages of additional medical documentation first provided by Napoli. Although these medical documents were dated from 2006 through 2010, none were previously disclosed. These only recently disclosed medical records provide the entirety of evidence supplied by Plaintiff's counsel in support of Mr. Tapia's alleged asthmatic injury. Although

---

[24] A copy of Napoli's response letter dated February 21, 2013 is annexed to the Leff Decl. as Exhibit H.

[25] Id.

[26] "Tier" Designations were created to delineate between the alleged severities of injuries between individual Plaintiffs pursuant to the settlement agreement drafted by the City of New York to determine payment amounts for settling Plaintiffs within the 21 MC 100 docket. There are four (4) distinct Tiers applicable to Plaintiffs: Tier 1 (No Injury); Tier 2 (Minimal Injury); Tier 3 (Moderate Injury); and Tier 4 (Severe Injury). The methodology to be used in assigning these Tier statuses was also created and intended to be utilized.

[27] Medical Documents provided to the Mediconnect website (acting as the main repository for all medical documents pertaining to Plaintiffs in the current docket) consisted of five (5) individual packets comprising 14 pages were uploaded on November 28, 2008, November 30, 2008, January 8, 2010, and December 29, 2010.

diagnosed at least seven (7) years ago[28] and prior to the implementation of TCDI, no mention of this injury is made until after his inclusion in Group II via Napoli's supplement on February 21, 2013.

Mr. Tapia's newly disclosed injuries were neither a worsening nor a deterioration of condition. Further, in what has been a standard practice by the Napoli firm, accompanying this January 24, 2013 Certification, was a spreadsheet listing all subsequent changes corresponding to the new Certification for submittal to the TCDI database. While this spreadsheet (and TCDI updates) now includes a new claim of lost wages in the arbitrary amount of $30,000, no such supporting documentation regarding the determination of this amount was indicated or otherwise provided.

### E. Discovery Related to Plaintiff Seweryn Wojciechowski

Similarly, the firm of Day-Pitney (a fellow defense group firm) prepared a deficiency letter identifying discrepancies and errors found within the Core Discovery responses and TCDI entries of Plaintiff Seweryn Wojciechowski while also requesting all medical authorizations and records necessary to proceed with depositions and discovery. Mr. Wojciechowski had been designated a Tier 3 Plaintiff on TCDI and was selected by Defendants for Group II discovery following the review of approximately 47 pages (dating from 2005-2009) of medical documentation available at that time.[29]

---

[28] Documents provided by Napoli following receipt of McGivney and Kluger's deficiency letter included the potential diagnosis of asthma made at Bellevue Hospital Center as early as January 5, 2006 and February 2, 2006. As late as April 16, 2010, the provided documents make reference to a potential diagnosis of asthma. Yet, no such documents were otherwise provided, nor were such claims made via TCDI, until Mr. Tapia's selection for Group II discovery.

[29] Medical Documents provided to the Mediconnect website (acting as the main repository for all medical documents pertaining to Plaintiffs in the current docket) consisted of four (4) individual packets comprising 47 pages were uploaded on December 17, 2010, February 23, 2010, April 13, 2010, and June 4, 2010.

The Day-Pitney deficiency letter was sent to Napoli on February 13, 2013.[30] In near concurrence to this letter being served, Napoli (also serving as Mr. Wojciechowski's counsel) submitted a new certification dated February 15, 2013 duly executed by Mr. Wojciechowski attesting to changes made to his Core Discovery responses and entries in the TCDI database. Accompanying the February 15, 2013 Certification was a spreadsheet listing all changes corresponding to the new Certification intended to be submitted into the TCDI database. As of February 27, 2013, TCDI updated the dates and hours Mr. Wojciechowski worked at WTC-related locations, his smoking history,[31] and new injuries now alleged. These newly disclosed injuries included Chronic Rhinitis, Chronic Pharyngitis, and Asthma, the last of which has been designated a Tier 4 injury. No supporting documentation was provided regarding dates of diagnoses or the medical rationale behind these new designations.

In response letters dated March 1, 2013 and April 5, 2013 (following a separate and additional request made on March 13, 2013 to provide documents not produced in response to the original February 13, 2013 deficiency letter), Napoli enclosed duly executed authorizations for various medical facilities and tax records as well as a total of thirty (30) additional pages of medical records.[32] Of these thirty (30) pages, the majority were from 2006 through 2009, with only two (2) pages were from this past year (February 8, 2012). Neither of these 2012 dated pages included abnormal findings or changes in condition. None of the additional records revealed a diagnosis of any of Mr.

---

[30] A copy of Day Pitney's deficiency letter, dated February 13, 2013 is annexed to the Leff Decl. as Exhibit I.
[31] Changed F23 (Field Regarding Smoking History) from "Former Smoker" (smoked cigarettes within the last 5 years) to "Non-Smoker" (does not fall into the above categories).
[32] Copies of the Napoli response letters, dated March 1, 2013 and April 5, 2013, are annexed to the Leff Decl. as Exhibits J and K, respectively.

Wojciechowski's altered TCDI responses or his newly disclosed Tier 4 designated diagnosis of Asthma. None of the records revealed a worsening or deterioration of condition. No mention of these conditions was made until after Plaintiff's inclusion in Group II discovery.

## ARGUMENT

It is readily apparent this Court's repeated instructions on the submittal and exchange of discovery have been ignored. Plaintiffs have repeatedly failed to follow the directives of this Court. As consistent with the Court's Orders, the current motion should be granted with Plaintiffs found to be in contempt, Mr. Tapia's and Mr. Wojciechowski's cases dismissed, and Defendants permitted to select replacements to allow discovery to proceed fully in the manner originally intended. In the alternative, Plaintiff's should be precluded from submitting evidence as to their newly disclosed injuries.

I.  **PLAINTIFFS ARE IN CONTEMPT FOR REPEATEDLY IGNORING THIS COURT'S DISCOVERY ORDERS REGARDING USE OF THE TCDI DATABASE**

Plaintiffs continued flouting of the Court's numerous discovery Orders is a flagrant abuse of the judicial process. Plaintiffs should not be permitted to benefit from their corrupting of Core Discovery and TCDI responses. Instead, the Court should invoke its inherent powers to dismiss Mr. Tapia's and Mr. Wojciechowski's lawsuits, and ameliorate the prejudice caused to the Defendants and the litigation's discovery process as a whole by allowing replacement Plaintiff selections.

A.  **This Court is Fully Authorized Pursuant to Fed. R. Civ. P. 37 to Sanction Plaintiffs For Continued Derision of This Court's Discovery Orders**

It has been thoroughly established that this Court is fully authorized and has the "inherent power to enforce compliance with their lawful orders through civil contempt."

*Gucci Am., Inc. v. Weixing Li*, No. 10 Civ. 4974(RJS), 2012 U.S. Dist. LEXIS 171520 (S.D.N.Y. Nov. 15, 2012) citing *Spallone v. U.S.*, 493 U.S. 265, 276 (1990) (internal quotations omitted). This "inherent power to hold a party in contempt reach[es] conduct before the court and beyond the court's confines and is a necessary function for purposes of managing and maintaining order in the efficient and expeditious administration of justice." *Cordius Trust v. Kummerfeld Assocs.*, 658 F. Supp. 2d 512, 515-16 (S.D.N.Y. 2009) citing *Leadsinger, Inc. v. Cole*, No. 05 Civ. 5606 (HBP), 2006 WL 2266312, at *8 (S.D.N.Y. Aug. 4, 2006) (stating that "[i]t is a firmly established principal that federal courts possess the inherent power to punish for contempt"); *Young v. U.S. ex rel. Vuitton et Fils, S.A.*, 481 U.S. 787, 798 (1987) (noting that the federal court's contempt power arose originally from the "disobedience to the orders of the Judiciary); *Chambers v. NASCO, Inc.,* 501 U.S. 32, 43 (1991) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates.").

The inherent purpose of this necessary judicial function is to compel any reluctant and difficult party within the course of litigation "to do what a court requires of [it]." *Gucci America, Inc.,* 2012 U.S. Dist. LEXIS 171520 at *9 (citation omitted).

1. Determination of FRCP Rule 37(b)(2)(A) Review:

The inherent ability of a Court to hold parties in contempt for failure to comply with court ordered discovery is well established pursuant to authority granted within Fed. R. Civ. P. 37 ("Rule 37"). Pertaining to the matter at bar, Rule 37(b)(2)(A) specifically states, in pertinent part, that "If a party...fails to obey an order to provide or permit discovery, including an order under Rule 26f, 35, or 37(a), the court where the action is

pending may issue further just orders."[33] See Fed. R. Civ. P. 37(b)(2)(A). When determining whether "contemptuous conduct" has taken place, actions including, "willful disobedience of, resistance to, or interference with the court's lawful process, order, directive, or instruction or its execution" should be considered. *Cordius Trust*, 658 F. Supp. 2d at 515, citing to 17 AM. JUR. 2D CONTEMPT § 22 (2008).

As previously cited by this Court, a conjunctive three-prong test is utilized in determining whether failure to comply with a court order may result in a finding of civil contempt. Such a finding may be reached when, "(1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Musalli Factory for Gold & Jewelry Co. v. New York Fin. LLC*, No. 06 Civ. 82 (AKH), 2010 U.S. Dist. LEXIS 58439 at *7, citing to *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir. 1995).

    a.   *The "Clear and Unambiguous" Prong*

Whether an Order may be considered "clear and unambiguous" requires it leaves "no uncertainty in the minds of those to whom it is addressed'" and who "must be able to ascertain from the four corners of the order precisely what acts are forbidden." *King*, 65 F.3d at 1051 citing *Drywall Tapers, Local 1974 v. Local 530, Operative Plasterers Int'l Ass'n*, 889 F.2d 389, 400 (2d Cir. 1989) (stating "a federal court [must] frame its orders so that those who must obey them will know what the court intends to require and what it means to forbid"). *See Yurman Studio, Inc. v. Castaneda*, Nos. 07 Civ. 1241, 07 Civ. 7862 (SAS), 2009 U.S. Dist. LEXIS 13870 at *6 (S.D.N.Y. Feb. 23, 2009) (emphasizing

---

[33] *See* Fed. R. Civ. P. 26(f): Duty to Disclose; General Provisions Governing Discovery, specifically regarding Conference of the Parties; Planning for Discovery; Fed. R. Civ. P. 35: Physical and Mental Examinations; Fed. R. Civ. P. 37(a): Motion for an Order Compelling Disclosure or Discovery.

that the "clear and ambiguous" element "requires that the order be specific in terms and that it shall describe in reasonable detail . . . the act or acts sought to be restrained." (internal quotations omitted).

In applying this three-prong test as established by the Second Circuit, there can be no question that this Court has repeatedly commanded all parties, via repeated written Orders,[34] oral dictates as expressed from the bench at court conferences,[35] and by previously dismissing Plaintiffs who had not timely certified their responses. Plaintiffs were fully aware of and understood all Orders issued by this Court given their repeated requests for extensions of time to meet Court deadlines in submitting proper certifications, their subsequent Rule 60(b) motion requesting the Court reconsider its decision, and Plaintiffs' ultimate appeal to the Second Circuit regarding the manner and necessity of these certifications.[36]

### b.   The "Clear and Convincing" Prong

The second prong of the three-prong test determining the validity of a civil contempt allegation is whether proof of the aforementioned noncompliance is "clear and convincing." The Second Circuit has held the standard to be used "requires a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred." *Gucci Am., Inc.,* 2012 U.S. Dist. LEXIS 171520 at *14 citing to *Levin v. Tiber Holding Corp.,* 277 F.3d 243, 250 (2d Cir. 2002).

---

[34] *See* Exhibits A-B, D; Order, *In Re: World Trade Center Lower Manhattan Disaster Site Litigation,* 21 MC 102 (AKH) (S.D.N.Y. November 17, 2011), ECF No. 4135, annexed to the Leff Decl. as Exhibit L; Order, *In Re: World Trade Center Lower Manhattan Disaster Site Litigation,* 21 MC 102 (AKH) (S.D.N.Y. December 8, 2011), ECF No. 4143, annexed to the Leff Decl. as Exhibit M.
[35] *See* Exhibit B.
[36] *See* Exhibit F; Order Fixing Errors in Prior Order, *In Re: World Trade Center Lower Manhattan Disaster Site Litigation,* 21 MC 102 (AKH) (S.D.N.Y. October 24, 2012), a copy of which is annexed to the Leff. Decl. as Exhibit N. Note that the October 24, 2012 Order is a one-page addendum to the Opinion and Order dated October 22, 2012 (or Exhibit F).

As outlined previously, Plaintiffs were repeatedly placed on notice as to the potential ramifications stemming from a lack of compliance with this Court's Orders. In spite of these clear Orders, Plaintiffs acted in defiance and changed both Mr. Tapia's Core Discovery responses via TCDI without providing proper documentation to the adverse parties in the litigation.[37] This change in Tier designation was not resultant from a deterioration in the condition of Mr. Tapia, but instead a failure by Plaintiff's counsel to properly and timely update discovery documentation. Plaintiff's alleged asthma condition was initially diagnosed (per analysis of the documents provided) as early as January 2006 and yet was not disclosed until February 2013.

Plaintiffs further ignored the edicts of this Court by altering the Tier-designation and injuries of Mr. Wojciechowski without proper accompanying documentation.[38] Plaintiff's alleged asthma condition is noted in passing via three (3) documents dated in 2008 and 2009 (per analysis of the documents provided); yet no official diagnosis or analysis has yet been provided nor was this condition disclosed until February 27, 2013. Further, the medical records of both Mr. Tapia and Mr. Wojciechowski were not updated in a timely manner, with some records made available only after their selections as Plaintiffs for Group II discovery. The sudden change in Tier designation for both Plaintiffs was not a worsening of injury but instead a willful omission of medical documentation which was not properly produced for years. Such actions are in willful violation of this Court's Orders and convincingly demonstrate in a clear manner Plaintiffs

---

[37] A copy of Plaintiff Cristhian Tapia's TCDI Replies is annexed to the Leff Declaration as Exhibit O.
[38] A copy of Plaintiff Seweryn Wojciechowski's TCDI Replies is annexed to the Leff Declaration as Exhibit P.

wanton disregard of the exhaustive efforts put forth by this Court to regulate discovery in a manner that is effective and efficient for all parties.[39]

### c. The "Lack of Reasonable Diligence" Prong

The final prong to determine if a party has committed civil contempt is if the offending party had "not diligently attempted to comply in a reasonable manner." *Musalli*, 2010 U.S. Dist. LEXIS 58439 at *7. The standard for ascertaining whether diligence occurred "requires a party to develop reasonably effective methods of compliance." *Zino Davidoff SA v. CVS Corp.*, No. 06 Civ. 15332 (RJS), 2008 U.S. Dist. LEXIS 36548 at *23 (S.D.N.Y. Apr. 17, 2008). Although the Second Circuit has not fully addressed what constitutes "reasonable diligence," it has noted "that 'substantial compliance' is the appropriate standard in evaluating noncompliance in a contempt case." *Gucci America, Inc,* 2012 U.S. Dist. LEXIS 171520, at *16, citing to *Yurman Studio*, 2009 U.S. Dist. LEXIS 13870 at *7.

Plaintiffs have neither been reasonably diligent nor substantially compliant in providing relevant and important medical documentation with supporting certification to Defendants regarding Mr. Tapia's allegation of injury upwards of six (6) years following its materialization. The fact that Mr. Tapia, a former Tier 2 Plaintiff—with a mere fourteen (14) pages of medical records when formal case selection of Plaintiffs for Group II discovery occurred, can suddenly be upgraded to a Tier 4 Asthma sufferer with minimal supporting documentation dating from 2006 through 2010 to explain such a dramatic "worsening" of condition, only continues to undermine the validity of the TCDI database, the goals of Group II discovery and the impartiality of this entire matter. The history regarding Mr. Wojciechowski is no different; a former Tier 3 Plaintiff with

---

[39] *See* Exhibits A-F, L-M.

approximately 47 pages of medical records (dating from 2005-2009) made available to Defendants for review who is upgraded to a Tier 4 Asthma sufferer not as a result of a worsening condition, but via the untimely production of documents allegedly claiming such injuries. Once more, Defendants honest use of TCDI to determine its selections for Group II discovery was rendered moot by the incomplete and derelict information submitted by Plaintiff's counsel.

There is no question that Plaintiffs have been repeatedly made aware of the importance of the integrity of the information contained in the TCDI database. The aforementioned Plaintiffs are simply examples of a more pervasive problem. The TCDI database's information has been corrupted by inaccurate or incomplete information. As a result, selections by Defendants and the Court for Group II discovery were premised on incorrect, outdated, and/or false data. Plaintiffs should not be permitted to benefit from their own reticence to this Court's numerous discovery Orders. Plaintiffs should therefore be found in contempt.

**B. This Court May Issue Corrective Measures to Right Past Wrongs and Ameliorate the Harm Caused to Defendants**

Sanctions determined upon a finding of civil contempt are intended to "coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance." *N. Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir. 1989). *See U.S. v. United Mine Workers of Am.*, 330 U.S. 258, 304 (1947); *Manhattan Indus., Inc. v. Sweater Bee by Banff, Ltd.*, 885 F.2d 1, 6 (2d Cir. 1989).

In devising sanctions, courts are granted "broad discretion to design a remedy that will bring about compliance." *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 673 F.2d 53,

57 (2d Cir. 1982). This Court has previously held that the determination of necessary sanctions should "secure future compliance with its order and to compensate the complaining party for past noncompliance." *Musalli,* 2010 U.S. Dist. LEXIS 58439 at *10. To elicit coercive remedies, this Court has previously considered: "(1) the character and magnitude of the harm threatened by the continued contumacy, (2) the probable effectiveness of the sanction in bringing about compliance, and (3) the contemnor's financial resources and the consequent seriousness of the sanction's burden." *Id.* at *10 citing *Bank of Credit & Commerce Int'l (Overseas) Ltd. v. Tamraz,* 97 Civ. 4759 (SHS), 2006 U.S. Dist. LEXIS 39256, at *8 (S.D.N.Y. June 13, 2006) (noting that the district court "has considerable discretion in determining whether a coercive sanction is necessary and, if so, the form it will take"). *See also Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Techs., Inc.,* 369 F.3d 645, 657 (2d Cir. 2004).

In determining what sanctions to impose to elicit Plaintiffs' compliance, the Court should take into account the continuing promulgation of discovery necessary. Here, Plaintiffs' objectionable actions are to the detriment of the entire litigation and place the validity of the entire discovery process into question. The inherent importance in having reliable information for the purposes of discovery was made readily apparent by this Court to all parties on October 22, 2012 when it issued its "Opinion and Order Denying Motions to Reinstate 22 Dismissed Plaintiffs" (the "October 22, 2012 Opinion and Order") for failure to properly certify their Core Discovery Responses. In rejecting Plaintiffs' argument that the reinstatement of dismissed cases would not harm Defendants or the discovery process, [40] this Court emphasized how the lack of proper information

---

[40] Plaintiffs brought a Rule 60(b) motion requesting this Court reconsider its December 8, 2011 Motion concerning the dismissal of 170 Plaintiffs based on Core Discovery deficiencies. *See* Exhibit M. This

affects all cases within this litigation when in the process of utilizing targeted discovery, and where carefully selected claimants serve as exemplars for the entire docket. In dismissing these cases, this Court noted the "Plaintiffs forget that the sampling was on the basis of a complete field of information relating to all viable cases, and that reinstatement of several for catch-up would skew the base of information. In order for sampling on an intelligent basis to succeed, the field from which the sample was chosen had to have a secure integrity, without changes or modifications in basic information as time goes by."[41]

In this regard, Defendants and the Court are still very much at the whim of Plaintiffs' counsel in how and when they determine to release the medical records and information concerning their clients. The events surrounding Mr. Tapia and Mr. Wojciechowski are but the latest in a series of changes and delays (as described above) altering the supposedly fixed and reliable nature of the TCDI database. It would appear not only is there more information regarding the medical histories of both Mr. Tapia and Mr. Wojciechowski which have not been updated in a timely fashion, but as of this writing, it is unknown whether other individuals selected by the Defendants and the Court as Tier 2 and Tier 3 Plaintiffs may also be suddenly "upgraded" with little warning, dubious reasoning, and limited rationale. Following years of warnings, statements, and even formal Orders issued by this Court, it is apparent Plaintiffs have simply chosen to disregard this Court's repeated requirements surrounding Core Discovery and TCDI responses.

---

Court's October 22, 2012 decision (*see* Exhibit D) is currently on appeal to the Second Circuit under docket number 12-87.

[41] *See* Exhibits D and N.

There can be little doubt as to the continuing importance of the TCDI database. Plaintiffs' complete disregard of the Court's Orders only hamper, delay, and undermine the integrity of the entire litigation.  As this Court has reiterated, "The importance of these cases is clear, to the litigants and to society. The ability of the court and counsel to cause them to progress towards resolution with due speed, economy and fairness depend very much on the ways that complex information can be organized and reported, reliably, responsively and consistently."[42]

There can be no lesser sanction to ensure future and continued compliance in this litigation than to dismiss Mr. Tapia's and Mr. Wojciechowski's cases in their entirety, and allow Defendants to select replacement Plaintiffs. In the alternative, Plaintiffs should be precluded from submitting evidence of any alleged injury other that already identified and disclosed unless accompanied by a current diagnosis. This resolution is the only manner by which to allow discovery to proceed in the manner originally intended; as a sufficient cross-section of the entire docket so that all parties involved have a full, true, and complete understanding of the varied alleged injuries claimed by Plaintiffs. To ensure the information being utilized by all parties' remains reliable as discovery continues, Plaintiffs should be enjoined from amending or supplementing alleged TCDI injuries or altering their Tier-designation status.

---

[42] *See* Exhibit A.

## CONCLUSION

For the reasons set forth above, Defendants respectfully request the Court grant its motion, enter an Order dismissing the claims of Cristhian Tapia and Seweryn Wojciechowski, as well as allowing the DLC to choose an alternate Plaintiff for Group II discovery.

Dated: New York, New York
       May 20, 2013

Respectfully submitted,

Richard E. Leff (RL-2123)
McGIVNEY & KLUGER, P.C.
80 Broad Street, 23rd Floor
New York, New York 10004
(212) 509-3456

*Attorneys for the Defendants*
*American Express Company, American*
*Express Bank, Ltd., American Express*
*Travel related Services Company, Inc., 90*
*Church Street Limited Partnership, Boston*
*Properties, Inc., Lehman Brothers Inc.,*
*Lehman Commercial Paper Inc., Lehman*
*Brothers Holdings Inc., and Member of*
*Defense Liaison Committee*