```
                                                         1
 1   UNITED STATES DISTRICT COURT
 1   SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
 3
 3   IN RE:  WORLD TRADE CENTER
 4   LOWER MANHATTAN DISASTER SITE      21 MC 102 (AKH)
 4   LITIGATION
 5
 5   ------------------------------x
 6
 6                  October 11, 2012
 7                  3:10 p.m.
 7
 8   Before:
 8
 9           HON. ALVIN K. HELLERSTEIN
 9
10                 District Judge
10
11              APPEARANCES
11
12   GREGORY J. CANNATA
12       Attorney for Plaintiffs
13
13   ROBERT A. GROCHOW
14       Attorney for Plaintiffs
14
15   WORBY GRONER EDELMAN & NAPOLI BERN, LLP
15       Attorneys for Plaintiffs
16   BY:  CHRISTOPHER LoPALO
16
17   McGIVNEY & KLUGER, P.C.
17       Attorneys for Defendant American Express
18   BY:  RICHARD E. LEFF
18
19   HARRIS BEACH PLLC
19       Attorneys for Defendant Century 21
20   BY:  STANLEY GOOS
20        BRIAN A. BENDER
21
21   KIRKLAND & ELLIS LLP
22       Attorney for Defendants
22   BY:  BRETT J. BROADWATER
23
23   PATTON BOGGS
24       Attorney for Defendant City of New York
24   BY:  ALYSON VILLANO
25
```

                                                          2

 1          (In open court)
 2          THE COURT:  Good afternoon, everyone.  Please be
 3   seated.  This is In Re:  WTC Lower Manhattan disaster site
 4   litigation.  21MC102.  I have the sign-in sheets.  And I thank
 5   you for the agenda that was submitted to me.
 6          Let me start with reviewing the order, short order
 7   filed July 24, 2012 -- actually was filed July 25, 2012, dated
 8   July 24, which reports the outcome of the previous case
 9   management conference that was held July 23, 2012.
10          That date I extended the August 3, 2012 deadline for
11   completing depositions and extended it to September 28, 2012.
12          The deadline for completing depositions of third
13   parties was extended to November 30, 2012.  And we set this
14   date today -- actually set it yesterday, adjourned it to today
15   as the next status conference.
16          The agenda will be, first, a report on how we are
17   fairing in relationship to the discovery deadlines.  And then
18   the parties will report to me on the status of discovery so far
19   regarding depositions by the plaintiffs -- of the plaintiffs,
20   physical and mental examinations, depositions of the
21   defendants, third party discovery, as one group of issues; and
22   the second the selection process and problems that seem to be
23   being experienced in the selection process for the next wave of
24   discovery.
25          The first is a report on where we stand with regard to

                                                          3

 1   the order of July 24, 2012.
 2          Who is going to make that report to me?
 3          MR. CANNATA:  I'll be happy to, your Honor.  Good
 4   afternoon.
 5          Your Honor, thus far we have completed --
 6          THE COURT:  Mr. Cannata.
 7          MR. CANNATA:  Thus far we have completed 67 defendant
 8   depositions covering 125 of the defendants.
 9          We have scheduled to be completed within the next
10   three weeks 16 more depositions which would cover 21 additional
11   defendants.  That would virtually complete all of the defendant
12   depositions.
13          We have completed 26 depositions of the plaintiffs and
14   all eight plaintiffs have been deposed.  However, there are
15   additional depositions of each of the plaintiffs that are
16   scheduled.  There are three more depositions that are
17   scheduled.  And that will bring it to 29 depositions for the
18   eight plaintiffs.  Obviously they are being deposed on a number
19   of days.
20          In addition, we have approximately 16 employers that
21   are going to be deposed in the litigation.  We have
22   approximately eight of them scheduled.  These employers, your
23   Honor, worked in numerous buildings.  So we've arranged with
24   the counsel for the employers to do several buildings at each
25   deposition.  Accordingly, each nonparty employer will be

                                                          4

 1   deposed over three or four days.  So that will be approximately
 2   45 or so depositions.
 3          So we have eight of them scheduled already.  That
 4   covers the first day of each of those eight.
 5          There are about twelve nonparty contractors that are
 6   going to be opposed.  And one of those has been scheduled.
 7          And then there is second witnesses from the
 8   defendants.  And we estimate there's approximately 20 of those.
 9   Five of them are already scheduled.
10          The difficulty that we're having now is that because
11   there's such an overlap between plaintiffs and defendants, the
12   attorneys handling, for example, that have an interest in a
13   particular plaintiff, their building can't be deposed or a
14   codefendant of their building can't be deposed the same day.
15   So we're having just scheduling problems.  But there's no
16   difficulty.  We're all cooperating.  We're just having
17   logistical problems.
18          For example, next week we have three scheduled but
19   we're trying to add a fourth one that I personally was going to
20   do and I said I can't do four depositions in a week.  But we
21   are working through the list and we are making very good
22   progress, I believe.
23          THE COURT:  But you can't make the deadlines.
24          MR. CANNATA:  I don't believe we're going to be able
25   to complete the deadline, your Honor, by --

5

1   THE COURT: Not a matter of thinking. You already
2   passed them.
3       The deadline for completing depositions of plaintiffs
4   and defendants had been August 3, was extended to September 28.
5   You need another extension.
6   MR. CANNATA: We do, your Honor. But I just want to
7   tell you that we are working diligently --
8   THE COURT: I'm not saying you're not.
9   Do you need another extension?
10  MR. CANNATA: I believe we will, yes.
11  THE COURT: What extension do you need?
12  MR. CANNATA: I would ask until the end of the year.
13  THE COURT: You're not going to finish. I don't want
14  to have another request for adjournment. I want to have a date
15  that will absolutely finish.
16  MR. CANNATA: Well one of the good things about short
17  dates, Judge, is that keeps us working hard.
18  THE COURT: We're past that.
19  MR. CANNATA: Okay. Well then I would say January 31.
20  THE COURT: Mr. Leff, can you live with January 31?
21  MR. LEFF: I think -- we will be able to finish all of
22  the plaintiffs' depositions and the defendants' depositions
23  probably even before the end of the year. It's the third party
24  and nonparty witnesses that will take some time.
25  THE COURT: Well is January 31 a realistic date?

6

1   MR. LEFF: Probably not.
2   THE COURT: Because I'm not going to give anymore
3   adjournments.
4   MR. LEFF: Probably not.
5   THE COURT: February 28.
6   MR. LEFF: I'm sorry?
7   THE COURT: February 28?
8   MR. LEFF: That's probably more realistic.
9   THE COURT: All right. February 28, 2013 is a new bar
10  date for finishing all depositions of all witnesses with regard
11  to the buildings that have been selected thus far. There will
12  be no further enlargements.
13      Could I have an identification of the buildings? Do
14  either of you have that information?
15  MR. CANNATA: Yes, your Honor, we do.
16  Would your Honor just like me to read it out, or do
17  you want me to e-mail it to the Court?
18  THE COURT: You can read it.
19  MR. CANNATA: I have a copy of it here if you want to
20  have your staff photocopy it, whichever you prefer.
21  THE COURT: Read it out and give me a copy.
22  MR. CANNATA: Okay. The Bank of New York. That's 101
23  Barclay.
24      One Broadway --
25  THE COURT: 101 Barclay Street.

7

1   MR. CANNATA: Yes.
2       One Broadway. 111 Broadway. 115 Broadway. 120
3   Broadway. The Century 21 Store and office building, which is
4   22 Cortlandt Street and 26 Cortlandt Street.
5       Seven Dey. One Liberty Plaza. One Wall Street. 160
6   Water Street. 200 Water Street. One, Two, and Three World
7   Financial Centers.
8       That was my list.
9       Napoli's list is 166 and 170 Broadway.
10  THE COURT: Is that one building?
11  MR. CANNATA: That's one building, your Honor.
12      233 Broadway. 130 Cedar Street. 90 Church Street.
13  That's the Post Office. 99 Church Street. 35 Exchange Place.
14  56 Hudson Street. 99 John Street.
15  THE COURT: Wait a minute.
16  MR. CANNATA: 99 John Street. 100 John Street. 130
17  Liberty Street. That's the Deutsche Bank.
18      59 Maiden Lane. 75 Park. 299 Pearl. 225 Rector.
19  250 South End. 90 Trinity. 100 Trinity. 45 Wall Street. And
20  140 West Street, which is the Verizon Building.
21      And just for the Court, of the ten largest buildings
22  by hours in the litigation, the entire litigation, that list
23  includes seven of the top ten buildings.
24  THE COURT: Say that again.
25  MR. CANNATA: We've calculated the number of hours by

8

1   building that all the plaintiffs worked in. So we've covered
2   already in wave one seven of the ten largest buildings.
3       So the others would be Four World Financial, 100
4   Church, and 345 Chambers.
5       So we've hit the largest buildings. And then it
6   varies from largest to one of the smallest buildings on the 38.
7   THE COURT: Is it too early to make any report of
8   impressions?
9   MR. CANNATA: I think we -- we're getting a sense as
10  to what the defenses are and the defense I assume are getting
11  an impression of what our claims are.
12  THE COURT: What about the distribution of severity of
13  injuries?
14  MR. CANNATA: Well we have a very limited group of
15  plaintiffs. There's only eight of them. I believe they are
16  all Tier IV. I know that's one of the goals of the second wave
17  is to pick up some of the lighter injuries.
18      As far as the defendants' impression --
19  THE COURT: What happened to the other seven?
20  MR. CANNATA: Sorry?
21  THE COURT: What happened to the others that were
22  chosen? They dropped out?
23  MR. CANNATA: Eight. We did eight in the first wave.
24  THE COURT: But you chose originally a number more.
25  MR. CANNATA: We chose ten originally. One was a

9

1   death case and it was decided not to proceed. Another one --
2       THE COURT: The death case withdrew the case?
3       MR. CANNATA: No, no. We withdrew it from the group
4   because it was a death case.
5       THE COURT: Yes.
6       MR. CANNATA: And then the other one was a service
7   problem that we withdrew.
8       THE COURT: But the case remains.
9       MR. CANNATA: The case remains but it wasn't chosen as
10  one of the exemplar plaintiffs.
11      I think you have to address the question about the
12  plaintiffs' case to the defendants.
13      THE COURT: Yes. I understand.
14      If we were to expand the list of plaintiffs, how many
15  plaintiffs would there be, do you estimate, covering all the
16  buildings you identified?
17      MR. CANNATA: All the buildings that --
18      THE COURT: How many plaintiffs worked in all the --
19      MR. CANNATA: There's 200 buildings in the entire
20  litigation.
21      THE COURT: We selected what?
22      MR. CANNATA: Thirty-eight in the first wave.
23      THE COURT: How many?
24      MR. CANNATA: Thirty-eight.
25      THE COURT: Thirty-eight. How many plaintiffs would

10

1   you estimate worked in those 38 buildings?
2       MR. CANNATA: I would say virtually all of them.
3   Because there's been a lot -- not all of them but -- I would
4   say 90 percent because most of the plaintiffs worked in several
5   buildings. And by picking up the biggest, heaviest buildings,
6   we've picked up most of the plaintiffs, but not all of them.
7   Some of are like, for example, an electrician who may have
8   worked in one building and that was it.
9       THE COURT: I understand. Why were only Tier IVs
10  chosen?
11      MR. LEFF: There is a Tier II, one Tier II case and
12  one Tier III case.
13      THE COURT: Among the eight?
14      MR. LEFF: Among the eight.
15      THE COURT: Remind me because I guess I was involved
16  in this. Why did we limit the sample to just so few
17  plaintiffs?
18      MR. LEFF: We had originally chosen fifteen, your
19  Honor. I believe the remainder dropped into ECF. They dropped
20  out. And we didn't select replacements. We just started to
21  get underway with what we had. It was late at that point
22  anyway, and I think we wanted to get discovery started. So we
23  didn't want to start that process all over again.
24      THE COURT: Anything to add to Mr. Cannata's report?
25      MR. LEFF: No, your Honor.

11

1       MR. CANNATA: Your Honor, just so the Court knows,
2   there's approximately 841 plaintiffs in the litigation at this
3   point.
4       THE COURT: There weren't 1600 cases?
5       MR. CANNATA: Many of them dropped out because of ECF
6   and some of them were dismissed by your Honor.
7       THE COURT: And there's an order going to come out
8   tomorrow dismissing the 22 that Mr. LoPalo has moved on. And I
9   think there are a few more that we identified in the course of
10  that who also will be dismissed.
11      But I had a run of open cases that came to me and I
12  counted 1600. So, obviously, there's a major discrepancy
13  between the court lists and the real active plaintiffs who
14  still remain in the case.
15      What can I do -- get that cleared? Can someone work
16  with someone in the clerk's office?
17      MR. LoPALO: Yes, your Honor. I'm assuming most of
18  those cases were probably from my office originally so I'll be
19  happy to take that on, your Honor, and clean up that list for
20  you.
21      THE COURT: So I'll have Rich Wilson get in touch with
22  you, Mr. LoPalo?
23      MR. LoPALO: Yes.
24      THE COURT: That finishes the report on how we fair in
25  relationship to what we set out to do.

12

1       Are there any issues regarding that phase of the case
2   that anyone wants to bring to my attention?
3       So, now let's think about what we do going forward.
4   We have a lot of work that has been outlined that will take us
5   to February. Should we be starting on another wave?
6       MR. CANNATA: Your Honor, I --
7       THE COURT: Involving more plaintiffs?
8       MR. CANNATA: I suggested that we select the
9   plaintiffs and the buildings, the defendants, now so that the
10  parties can upload to the computer service the relevant
11  documents and medical records so we won't have a delay like we
12  had in the first wave.
13      What happened initially was much material was sent up
14  to Merrill. But in some cases it wasn't in usable form. It
15  was just a million documents thrown into the systems. So we
16  asked the defendants, and they cooperated, to organize it so we
17  could identify it and use it easier.
18      Likewise, on the plaintiffs' side, the defendants
19  asked for medical records, authorizations, and the like. And
20  that took some time.
21      So if we can designate the next wave sooner rather
22  than later, even if we don't begin the depositions until
23  February 1 or some time thereafter, it will at least get the
24  parties to get the depositions ready.
25      THE COURT: How many plaintiffs shall we sample?

13

1  MR. CANNATA: We were talking about 30, Judge. But I
2  think the key is the number of buildings that those plaintiffs
3  worked in.
4  THE COURT: How many building should we sample?
5  MR. CANNATA: I was thinking maybe 50, if we could do
6  50 smaller buildings -- I don't know how many plaintiffs that
7  would actually be. We would have to see which plaintiffs are
8  picked.
9  We have had discussions with the special master.
10  THE COURT: So we have had 38 buildings so far. How
11  many buildings in all are there?
12  MR. CANNATA: 200.
13  THE COURT: What would be the criteria for choosing a
14  building?
15  MR. CANNATA: Just that if the plaintiff worked there.
16  THE COURT: You said smaller buildings.
17  MR. CANNATA: Well --
18  THE COURT: The 38 are the largest. You have another
19  eight --
20  MR. CANNATA: No. The 38 weren't the largest, Judge.
21  Seven of the ten were large buildings. The other 31
22  were smaller -- midsize and smaller buildings.
23  The numbers drop off very quickly. After the tenth
24  building -- the tenth building is 2.76 percent of the hours.
25  And the last building has less than one one-hundredths of a

14

1  percent because it's such a small number of hours.
2  THE COURT: What would be the criteria? How would you
3  go about choosing 50 small buildings?
4  MR. CANNATA: That's what I'm saying. If you pick the
5  plaintiffs, that will give us new buildings in addition to the
6  buildings we've already done, which obviously we won't have to
7  do over again. Where we've been --
8  THE COURT: So you would start by picking 30
9  plaintiffs?
10  What would you start, by picking smaller buildings?
11  MR. CANNATA: No. You can't go that way. You have to
12  go by the plaintiffs, I think.
13  THE COURT: So pick 30 plaintiffs.
14  MR. CANNATA: We've already started looking at the
15  plaintiffs. We tentatively picked ten.
16  MR. GROCHOW: The ten plaintiffs that were tentatively
17  picked add about 25 buildings; plus a lot of overlap from phase
18  one. So if you add another -- when that group of ten
19  plaintiffs was picked, your Honor, it was looking at what
20  buildings they were in so we could add buildings to the mix.
21  THE COURT: You said he they worked in about 25 of
22  them.
23  MR. GROCHOW: Just by adding in ten, we've added
24  approximately 20 to 25 new buildings. If we end up with 30
25  plaintiffs and that same logic is used by the defendants

15

1  picking, and the special masters using that as well, that 25
2  number may go up to 40 or 50.
3  It's just that there's a tremendous amount of overlap.
4  You may have a plaintiff in phase two that worked in four
5  buildings in phase one.
6  THE COURT: So plaintiff would want to choose ten
7  plaintiffs.
8  And then, Mr. Leff, I guess the defendants would want
9  to choose ten plaintiffs.
10  And the special masters will then choose ten
11  plaintiffs.
12  MR. GROCHOW: That was actually the agreement that had
13  been worked out and we had conferences with the special masters
14  on that over the last two weeks.
15  THE COURT: I heard that there was a problem,
16  Mr. Leff.
17  MR. LEFF: There was a problem but I think that
18  Mr. LoPalo and I may have worked out that problem so it
19  shouldn't be an issue any longer.
20  THE COURT: Well I'd like to hear about the problem
21  because --
22  MR. LoPALO: Maybe I could address it, your Honor.
23  A couple weeks ago we had a conference call with the
24  special masters on the phone and we agreed at the time that I
25  was going to prepare a spreadsheet and circulate it amongst the

16

1  parties and the special masters so everybody could use this
2  spreadsheet as a tool to select cases for group two. This
3  spreadsheet was prepared by my office and circulated by me
4  about two weeks ago.
5  Once it was circulated, it was brought to my attention
6  that the data in the spreadsheet was not accurate. And we had
7  a conference call just last week and it was raised again by
8  multiple parties on the phone conference. I explained during
9  the phone conference that this was a spreadsheet that was given
10  to me a couple days ago before I circulated it. To my
11  knowledge, it was the best information currently available.
12  After the phone conference I looked at it in more
13  detail and basically the data that was circulated was not
14  verified data. It was old data that should not have been
15  circulated amongst the parties.
16  And basically we discussed on the phone conference
17  that the issue should be resolved by using the sworn to
18  testimony by the plaintiffs that's in the TCDI database and for
19  me to take that data and prepare a spreadsheet and circulate
20  that amongst the parties and that will be the data that's used
21  by everybody, the sworn data by the plaintiffs, to pick the
22  next group of cases.
23  THE COURT: That would mean you'd to be precluded from
24  changing it.
25  MR. LoPALO: I'm sorry, your Honor?

17

1    THE COURT: You would be precluded from using any
2    information other than that which is in the sworn data.
3        MR. LoPALO: For picking the cases, correct.
4        THE COURT: Or for any other purpose.
5        MR. LoPALO: Well I guess down the road.
6        THE COURT: You cannot prove anything that you're not
7    disclosing.
8        MR. LoPALO: Right. But don't the parties have the
9    right to supplement their discovery responses if new
10   information comes in.
11       THE COURT: Timely.
12       MR. LoPALO: In the discovery process.
13       THE COURT: Timely. If you know information or should
14   know information now.
15       MR. LoPALO: Right.
16       THE COURT: You need to timely supplement it.
17       MR. LoPALO: Right.
18       THE COURT: And in this case I'm going to insist on a
19   motion because it's got to be justified otherwise you're going
20   to be precluded.
21       MR. LoPALO: Understood.
22       THE COURT: And if the information proves not to be
23   reliable, then there could be much more serious sanctions.
24       I'm giving everyone fair notice. I have a vested
25   interest in the reliability and integrity of the court

18

1    processes. That means that sworn answers are sworn as to the
2    truth. And if a person doesn't know, he can't swear.
3        So the answers that are given to the TCDI are the
4    answers that everyone will rely on without thinking that there
5    will be changes. It will not be a moving field. It will be a
6    stable field.
7        Of course, you all know that life doesn't limit itself
8    that way. Injuries erupt. Injuries change. And I can
9    understand that more recent basis for change will cause change.
10       But we should have a fixed environment with where
11   people worked and how many hours they worked. I don't
12   understand how more recent information can change that.
13       And with regard to injuries, if someone should have
14   known something three years ago and only seeks a supplement
15   now, I won't allow it.
16       So I want everybody to understand this. This is a
17   fixed field; reliable, integral information on which everyone
18   can rely. That's why I insisted throughout this process that
19   answers be sworn to as true. That's why I dismissed cases.
20   That's why I was so annoyed with the process that went on in
21   the one hundred cases. We will not duplicate that.
22       MR. CANNATA: Your Honor, may I ask the court a
23   question.
24       If there's a newly diagnosed illness, for example, a
25   plaintiff comes down with cancer.

19

1    THE COURT: All these possible things, I suspect if
2    that happens, there will be an effort to supplement quickly.
3        MR. CANNATA: I'm asking though would you require a
4    motion for that or not?
5        THE COURT: I shouldn't think so. I don't want to.
6    The rules provide that as a possibility.
7        I think if you're all working in good faith, then I
8    don't need a motion. But when I heard from the special masters
9    what the issue was, it annoyed me greatly.
10       What you put out does not affect the integrity of the
11   process. It enhances the integrity of the process. What I
12   heard raises a question about the integrity of the process and
13   that's what made me so annoyed.
14       Mr. Leff.
15       MR. LEFF: A lot of the issue we had experienced with
16   the first group was that the TCDI database would change almost
17   up to the day before the deposition of the plaintiff.
18       THE COURT: It can't change -- I guess if it's not
19   clear, I'm going to issue an order.
20       Every piece of information in the TCDI database is the
21   basis of someone swearing it as true. There should be no other
22   information in the TCDI database; and if there is, we've got a
23   serious problem.
24       Do you appreciate that is the case, Mr. Leff?
25       MR. LEFF: Yes. We agree with you, your Honor.

20

1    THE COURT: Do you appreciate that the data in the
2    TCDI database is, all of it, based on sworn information?
3        MR. LEFF: Yes, your Honor.
4        THE COURT: Mr. LoPalo.
5        MR. LoPALO: Yes, your Honor.
6        THE COURT: Then if there's an isolated situation
7    where someone needs to update, I don't need to have a motion.
8    But if there's a wholesale list of change, I do want a motion.
9    And any party can object and raise it and forward the motion to
10   me. Motions will not be necessary if you proceed on consent.
11   If you don't, a motion will be required.
12       Now if it's a common understanding that all the
13   information in the TCDI database had been sworn to as true, I
14   don't need to issue any additional orders. There have been
15   more than enough already.
16       So we have this process of the plaintiffs identifying
17   ten. And then I take it, Mr. Leff, you will identify ten.
18       MR. LEFF: Yes, your Honor.
19       THE COURT: And then the special masters will identify
20   ten. And these 30 plaintiffs and the buildings that they
21   worked in will be the objects of the next -- subject of the
22   next wave of discovery, following February 28.
23       So we need a few things. We need a timetable for the
24   selection process. And we need a date where I can see you
25   again.

21

1 MR. LEFF: The first aspect of it would be to allow
2 the plaintiffs -- to allow Mr. LoPalo's office to change and
3 adjust that spreadsheet so it reflects accurate data. So how
4 much --
5 THE COURT: How much time do you need, Mr. LoPalo?
6 MR. LoPALO: Need about a week, your Honor, to prepare
7 that. By next Friday.
8 THE COURT: Then a week for the plaintiff to choose.
9 MR. GROCHOW: That's fine, your Honor.
10 THE COURT: That's 14 days.
11 And then defendants choose, 21 days.
12 Special masters, 28 days.
13 Then we have a fixed list which will be published.
14 Who will undertake the obligation to publish that
15 list, give me a copy, that will list the plaintiffs and the
16 buildings for each plaintiff.
17 MR. CANNATA: We'll be glad to do that, your Honor.
18 THE COURT: So that takes us out about a
19 month-and-a-half. That will be mid-December. So I should see
20 you probably sometime in January.
21 The meeting in January will be -- do we need to meet
22 in January or February before the completion of the first wave
23 of discovery? There is no harm. Why don't we fix a meeting.
24 If we don't need it, we can always call it off.
25 How about 3:00 January 16?

22

1 So we'll fix a schedule for wave two depositions
2 because by that time we'll have the schedule and the
3 spreadsheet for everyone. And you can come in and recommend a
4 schedule for the second wave of discovery.
5 Are there any other issues or problems with regard to
6 that second wave so far?
7 MR. GROCHOW: Just a question, your Honor. Do I
8 understand that the defendants' selections as well as the
9 court's selections will also emphasize the issue of adding
10 buildings, not just be looking at the plaintiff from an injury
11 standpoint?
12 THE COURT: I think the defendants will choose the way
13 they wish to. The special masters will choose the way they
14 wish to. But each choice will identify buildings in which
15 people worked.
16 MR. GROCHOW: But is the goal that we add as many
17 possible new buildings as possible? In other words, if the
18 plaintiffs' group, for example --
19 THE COURT: I think each group has different
20 motivations. Each choice will be differently motivated and I
21 don't want to limit it.
22 MR. GROCHOW: Okay.
23 THE COURT: Do you think I should limit it?
24 MR. GROCHOW: I think that there is a tremendous logic
25 to adding as many buildings as possible.

23

1 THE COURT: I think there is but each party will be so
2 minded.
3 MR. GROCHOW: I mean it may happen just by
4 coincidence. I'm just saying that there should be some
5 rationale in the selection process that looks at the buildings
6 the plaintiff was working at to intentionally add as many
7 possible buildings up to some number that we could deal with.
8 THE COURT: I think we'll be mindful in the special
9 masters' selection of having diversity. We'll be looking at
10 what each of you did and trying to fill in various gaps. But I
11 can't tell you that that will be the only criterion.
12 MR. GROCHOW: Okay. Thank you.
13 THE COURT: Mr. Leff, do you want to make a comment?
14 MR. LEFF: I think we both -- both sides want to get
15 most of the buildings involved. So I think we'll make the best
16 efforts to pick various -- all of the buildings as well as pick
17 plaintiffs that are in various tiers to get a fair cross
18 representation of the types of plaintiffs in the litigation so
19 we can have that type of --
20 THE COURT: So we'll just leave it up to the
21 individual choice, consider that the natural consequence of
22 selection will be a sufficient diversity to allow each party to
23 make judgments that are necessary for the ongoing case.
24 So, let me move on to another issue that I want to put
25 before you. At some point in this process we should be able to

24

1 form some initial impressions not about defenses but about the
2 distribution of people, the distribution of severity of injury
3 per building and I guess per plaintiff to form various kinds of
4 statistical curves. And I think if we were to focus on that,
5 perhaps after the January 16 meeting, we might be able to
6 economize on some time and try to create some sense of values
7 for the case. If I'm premature, then of course we can't. But
8 I'd like to have us try, if we can. I think early valuations
9 will be to the benefit of the parties certainly and of counsel.
10 Why don't we talk about it January 16.
11 This is Professor Twerski.
12 PROFESSOR TWERSKI: As Mr. LoPalo indicated, last
13 week, that there's been additional information that's come in.
14 Then if I understood Judge Hellerstein correctly, that
15 information is -- should be now re-supplemented and should be
16 supplemented quickly because it could come in --
17 THE COURT: Well I think the sense of my remarks is
18 that whether or not there's going to be supplementation will be
19 up to Mr. LoPalo. But if there is a substantial
20 supplementation, it will have to be by motion. And if there is
21 no supplementation and there is no basis that's proper for the
22 supplementation, there will be preclusion of proofs. If the
23 issue is large enough to raise questions about the integrity of
24 the information given so far under oath, we'll have to examine
25 what sanction will be appropriate.

Hearing before Hon. A.K. Hellerstein (21 MC 102)  10/11/2012  3:10:00 PM

25

1 It is critical that we have stability in this process.
2 Otherwise, the process becomes arbitrary.
3  That finishes my agenda.  Is there anything else
4 anybody wishes to bring up?
5  Have success at your work.  Get along well.  Enjoy the
6 holidays as they come up.  I'll see you again January 16.
7  (Adjourned)